COMMON CAUSE, RESPONDENT, v. NEW JERSEY ELECTION LAW ENFORCEMENT COMMISSION, APPELLANT, AND BATEMAN FOR GOVERNOR COMMITTEE, INTERVENOR-APPELLANT.

Submitted July 12, 1977—Decided July 29, 1977.

232

*Mr. Edward J. Farrell* submitted a brief on behalf of appellant New Jersey Election Law Enforcement Commission.

*Mr. John P. Sheridan* submitted a brief on behalf of appellant Bateman For Governor Committee.

*Mr. William Singer* submitted a letter in lieu of a brief on behalf of respondent (*Messrs. Fuerst, Singer and Jacob,* attorneys).

PER CURIAM. ▮ Litigants in this case have asked us to consider the validity of a regulation adopted by the New Jersey Election Law Enforcement Commission pursuant to the authority vested in it under the Campaign Con-

tributions and Expenditures Reporting Act, *N. J. S. A.* 19:44A–1 *et seq. N. J. S. A.* 19:44A–38. Respondent Common Cause argues that the regulation in question, *N. J. A. C.* 19:25–15.36, is impermissibly broad in scope and conflicts with both the express language and purpose of the act.[1] It asserts that the regulation conflicts with (1) the clear mandate of the statute by allowing a successful primary candidate who elects not to receive public funds to accept contributions in excess of $600 for the purpose of paying primary campaign debts, and (2) the express terms of the statute by providing that it shall not apply to primary election expenses incurred in connection with the primary held this year. Intervenor, Bateman for Governor Committee, has advanced other arguments which are discussed herein. We are satisfied that the regulation impermissibly

---

[1] *N. J. A. C.* 19:25–15.36 provides:

Payment of primary expenses after date of primary

No person or political committee shall make any contribution or contributions to a candidate, his primary election campaign treasurer or to any other person or committee on behalf of the winner of the primary election for the office of Governor in the aggregate in excess of $600.00 after the date of the primary election for the purpose of paying off primary election expenses of such winning candidate, provided, however, that the foregoing provision shall not be applicable in the case of a winning candidate who has elected not to receive public funding. All such contributions shall be reported in the regular fifteen day post-election report or the subsequent sixty day reports with respect to such primary. Such contributions shall not be deemed to be contributions to the candidate in the general election for any purpose, including the $600.00 contribution limit. Nothing herein contained shall be construed to permit expenditures before or after the date of a primary election by the state committee, county committees, or municipal committees of any political party with respect to the primary election expenses of the winner of a primary election for the office of Governor or of any other primary election candidate.

This regulation shall not be applicable to primary election expenses incurred in connection with the primary election held on June 7, 1977, but shall be applicable to primary election expenses of every primary election held after that date for nomination of candidates for the office of Governor.

exceeds the scope of the authority vested in the Election Commission.

This matter was initially heard before the Appellate Division. *R.* 2:5–1(e). Although that court denied the motion by Common Cause to stay application of the regulation, it did grant its request to have the appeal accelerated. *R.* 2:9–2. Leave to intervene was granted to the Bateman for Governor Committee. *R.* 4:33. Although notified of the appeal, the Citizens for Byrne Committee elected not to intervene in the suit.

The Appellate Division held in a *per curiam* opinion that the regulation was illegal and void. 151 *N. J. Super.* 265. (1977). After finding that Common Cause had standing to contest the provision, it noted its agreement with each of the respondent's arguments which had been asserted as a basis for holding the regulation invalid. We granted certification, 75 *N. J.* 23 (1977). Because of the public interest in resolving this dispute as quickly as possible, we have similarly heard this case on an accelerated basis, foregoing oral argument. *R.* 2:11–1(b).

█ We conclude that respondent has standing to raise the issues presented by this appeal. Common Cause, a nonprofit corporation of the District of Columbia, asserts that one of its major purposes is making government more responsive by reforming the political process. It alleges that it has over 12,000 dues-paying members in New Jersey whose interests it purportedly represents in this suit. In *Crescent Pk. Tenants Assoc. v. Realty Eq. Corp.,* 58 *N. J.* 98 (1971), this Court considered the problems of standing with respect to a nonprofit association. Writing for the Court, Mr. Justice Jacobs concluded that standing was appropriate "where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness." 58 *N. J.* at 107. Applying that test, he found that the complaint filed by the tenant association there was "confined strictly to matters of common interest and [did] not include any individual grievance which might perhaps [have been] dealt with more appro-

priately in a proceeding between the individual tenant and the landlord." *Id.* at 109. Similarly, we conclude that the impact of the instant regulation on respondent's membership and its declared interest in improving government provides it with a sufficient basis for claiming standing to contest the Commission's action. *See also United States v. SCRAP*, 412 *U. S.* 669, 93 *S. Ct.* 2405, 37 *L. Ed.* 2d 254 (1973); *Scenic Hudson Preservation Conf. v. Federal Power Comm.*, 354 *F.* 2d 608 (2 Cir. 1965), *cert.* den. sub nom. *Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conf.*, 384 *U. S.* 941, 86 *S. Ct.* 1462, 16 *L. Ed.* 2d 540 (1966); *Common Cause v. Democratic National Committee*, 333 *F. Supp.* 803, 808–09 (D. D. C. 1971).

Turning to the merits of the controversy, we first consider the proviso which excepts winning candidates who elect not to receive public funds from the $600 limitation on post-primary contributions for the purpose of defraying primary expenses. Although the regulation prohibits by its terms post-primary contributions in excess of $600 for the purpose of paying off primary election expenses of a winning candidate, it adds that this provision "shall not be applicable in the case of a winning candidate who has elected not to receive public funds." It is contended that this provision conflicts with the $600 limit on contributions embodied in *N. J. S. A.* 19:44A–29(b), which provides:

No person or political committee, except the State committee, county committees and municipal committees of any political party, otherwise eligible to make political contributions, shall make any contribution or contributions to a candidate, his campaign treasurer, a State committee, county committee or municipal committee of any political party, or to any other person or committee, in behalf of the winner of a primary election for the office of Governor in the aggregate in excess of $600.00 *for any purpose after the date of such primary election.* No candidate for election to the office of Governor in a general election who has won the preceding primary election. and no campaign treasurer or deputy campaign treasurer of such candidate shall knowingly accept from any person or political committee, except the State committee, county committees and municipal committees of any political party, any contribution or contribu-

tions in the aggregate in excess of $600.00 *for any purpose after the date of such primary election.* [Emphasis added].

Intervenor, on the other hand, argues that the clear intent of the Legislature was to regulate only campaign contributions to the general election. Although agreeing with appellant Commission that the Appellate Division erroneously interpreted *N. J. S. A.* 19:44A–29(b), it urges us to hold that the act makes *no* provision for contributions associated with primaries. Consequently, it would presumably leave contributions to be utilized for paying off primary debts totally unregulated, regardless of whether or not a candidate was receiving public funds.

Admittedly, both the express wording of the statute and its legislative history demonstrate that the primary thrust of the act was aimed at regulating contributions in general elections. *N. J. S. A.* 19:44A–28 specifically provides:

> The provisions of this act shall apply to the general election campaign for the office of Governor to be held in November, 1977 and to all subsequent campaigns for election to the office of Governor, except that the provisions of this act shall not apply to any general election campaign for the office of Governor for which the Legislature fails to make an appropriation.

Moreover, the expression of public policy embodied in the act also indicates that the Legislature was concerned with the conduct of general elections when they passed the instant statute. *N. J. S. A.* 19:44A–27 states:

> It is hereby declared to be a compelling public interest and to be the policy of this State that general election campaigns for the office of Governor shall be financed with public support pursuant to the provisions of this act. It is the intention of this act that such financing be adequate in amount so that candidates for election to the office of Governor may conduct their campaigns free from improper influence and so that persons of limited financial means may seek election to the State's highest office.

And lastly, we note that the legislative history surrounding the passage of the act uniformly indicates an intent to pro-

hibit large contributions *at the general election level.* The statement to Assembly bill 1246, which in its amended form eventually became Article II of the Campaign Contributions and Expenditures Reporting Act, *L.* 1974, *c.* 26, reiterates this same emphasis on regulating the conduct of the general election campaign:

> This bill provides partial public financing of general elections for Governor beginning in 1977 . . . . Individual contributions, including transfers of money, loans and donations of things of value, to gubernatorial candidates in the *general election* are limited to $600.00. . . .
>
> [Emphasis added]

*See also Public Hearing Before Assembly State Government and Federal Committee on Assembly,* No. 1246, March 28, 1974, at 6, remarks of Assemblyman Albert Burstein (stating his expectation that "there will be a bill succeeding this to cover primary campaigns.") ; *id.* at 94–95, remarks of Richard C. Leone, State Treasurer ("This bill doesn't solve the problem of what's wrong with fund raising in the primaries.").

Nevertheless, these facts do not necessarily lead to the position urged upon us by intervenor: that the Legislature made no attempt to limit campaign contributions associated with primaries *after* the date of such primaries. The express wording of *N. J. S. A.* 19:44A–29(b) points in a contrary direction. That provision explicitly prohibits payments "in behalf of the winner of a primary election for the office of Governor in the aggregate in excess of $600.00 *for any purpose after the date of such primary election."* [Emphasis added.] It also prohibits any candidate or his treasurer or deputy treasurer from accepting from any person or political committee "any contribution or contributions in the aggregate in excess of $600.00 *for any purpose after the date of such primary election."* [Emphasis added.] The Appellate Division found that the limitation "for any purpose" in-

cluded payments which were made for the purpose of reducing primary debts. We agree.

Intervenor's interpretation of the statute would leave the legislation ineffective in guarding against the very evil which it was designed to combat: the improper influence which a contributor gains when he is able to give a candidate a large contribution near the end of the campaign. *See Public Hearing, supra,* at 3, statement of Assemblyman Burstein, sponsor of the bill ("the objective of the bill [is] . . . to do away with the inordinate influence of large contributors") ; *id.* at 28, statement of former Senator William Schluter ("The obvious objective of public financing is to remove improper influences from the electoral and governmental processes before they appear"). Under intervenor's interpretation of the statute, a contributor would be free to give a candidate *any* amount of money at *any* point during the general election, even on the eve of the general election. The only stipulation would be that it must be used to pay off primary debts. Such a result would undermine the legislative purpose in enacting the provision, since, presumably, such a contribution would have as great an effect on a candidate as one which was made at the same time and for the same amount, but which was intended to be used for paying general election debts.

Intervenor assumes that since the Legislature passed the act over strenuous calls to expand coverage to include primaries,[2] it had no interest in regulating primary financing

---

[2]For instance, Richard Zimmer, Vice Chairman and Legal Affairs Director of New Jersey Common Cause stated at the hearings:

This bill does only half the job and in trying to do half the job, it does nothing at all effectively. We still have the same old system of nominations. How can you cleanse the system when you don't even address the integral part of it, which is the nominating process.

It has been argued that this bill should be passed as a "first step" in a continuing process of campaign reform. We disagree with this suggestion. To pass a bill that spends $2,000,000 of public funds in the name of campaign reform while not effectively

during a general election. We agree that such comments indicate that the Legislature had to be aware of the potential for abuse by allowing large contributions during the primary stage of the election. However, we cannot imagine that it would have intended to magnify such abuses by allowing large contributions to continue up until the eve of the general election. It is far more probable that the Legislature would have wanted to limit improper influences as far as possible by prohibiting contributions in excess of $600 after the date of the primary elections. The straightforward command of the statute is well-grounded in policy and should not be ignored by this Court.

Moreover, intervenor's interpretation of the statute would leave courts in the difficult situation of trying to determine whether or not debts were incurred in the primary or the general election, and whether or not such contributions were earmarked for paying off primary debts. A candidate could

---

blocking large contributions is not a first step. It is no step at all. It is not half a loaf; it is merely an expensive wrapper.
[*Public Hearing, supra,* at 53–54]
The Bateman for Governor Committee argues that Common Cause's remarks indicate its assumption that the bill left primary campaign financing completely untouched. However, it is clear that Common Cause correctly interpreted the bill to allow contributions in excess of $600 only up until the date of the primary. At the hearings, Zimmer stated:

Under A.1246, if an individual wants to buy the gratitude of a governor, he can still do it. If a governor wants to exact political contributions in exchange for favors from the state, he can still do it. It is true a contributor cannot give more than $600 under A.1246 to a gubernatorial candidate in a general election campaign. However, he can contribute unlimited amounts to the candidate during the primary election campaign, when large contributions are highly valued. If he bets on the wrong candidate in the primary, he will not lose his opportunity to make a large contribution, since he can make unlimited contributions to the winning candidate's state party committee in the year following the gubernatorial election (on Inauguration Day, for instance).

Conspicuously absent from his discussion is the possibility of giving a large donation to a winning candidate after the primary, but before the general election.

subvert the entire purpose of the $600 limitation by earmarking all contributions of $600 or less for the general election, leaving the large contributions, whenever they are made, to be used in connection with the primary. *Cf. Buckley v. Valeo,* 424 *U. S.* 1, 30, 96 *S. Ct.* 612, 46 *L. Ed.* 2d 659, 694 (1976) (noting that the difficulty in isolating suspect contributions provides a sufficient justification for limiting large contributions).

Although the legislative history concededly provides some support for intervenor's interpretation of the statute, there is ample evidence that the Legislature intended to prohibit all contributions in excess of $600 after the date of the primary. Significantly, the bill originally provided:

No person or political committee, otherwise eligible to make political contributions, shall make any contribution or contributions in aid of the candidacy of a candidate for election to the office of Governor in a general election in the aggregate in excess of $600.00, except as provided by this section. No candidate for election to the office of Governor in a general election campaign and no campaign treasurer or deputy campaign treasurer of such candidate shall knowingly accept from any person or political committee, and contribution or contributions in aid of such candidate's candidacy in excess of $600.00, except as provided by this section.

Amendments limiting contributions after the primary "for any purpose," were adopted on April 1, 1974, several days after hearings on the bill had been conducted. Thus, witnesses who stated that the bill had no applicability to primary finances may not have even been aware of the proposed amendments. See *ante* at 238. Significantly, one witness who did consider the applicability of the April 1 amendments interpreted the bill in the manner urged by respondent. Attorney Ed Lloyd, appearing for the Public Interest Research Group, commented that the bill

as amended by the proposed Assembly Committee Amendment would only limit contributions to $600 — after the date of the gubernatorial primary. As stated above, this would permit the evils which the bill is designed, or intended, to eliminate to continue right up

until the day of the primary, at which time, and after which, these practices will be stopped.

[*Public Hearing, supra,* at 77]

*See also ante* at 239–40 n. 2.

Although we agree with the Commission's finding that the Legislature intended to limit campaign contributions after the date of the primary, we do not reach its conclusion that the statute permits a distinction to be drawn between candidates who elect to receive public funds, and those who finance their campaign solely out of private contributions. The regulation provides that the $600 limitation shall apply to candidates seeking to use contributions to pay off primary campaign debts, but that this limitation "shall not be applicable in the case of a winning candidate who has elected not to receive public funding."

There is no support for the Commission's interpretation of the statute, either in the express language of the provision or in the purposes which the act was intended to achieve. *N. J. S. A.* 19:44A–29 lacks any support for a distinction between candidates who elect to receive public funding and those who do not. As we have already stated, one of the primary purposes of the act was to eliminate the improper influence which might result if a contributor were allowed to offer large sums of money to a candidate during the general election. See *ante* at 238–239. Such influences are just as strong whether or not a candidate is receiving public funds.

Nor do we accept the Commission's conclusion that application of the contribution limitations to a candidate who is not receiving public funds would conflict with the Supreme Court's opinion in *Buckley v. Valeo, supra.* In that case the Court upheld limits on contributions even though the statute there, 18 *U. S. C. A.* § 608(b), imposed a $1000 ceiling on campaign donations without regard to whether or not the candidate was receiving public funds. Since the statute there also limited eligibility for public funds, see 424 *U. S.* at 86, 46 *L. Ed.* 2d at 726, the court's opinion must be read as impliedly accepting the premise that contributions to a candi-

date could be limited even though he was ineligible to receive public funds.

Because this interpretation of the statute creates a conflict with the Commission's regulation, the latter must be held invalid. As this Court stated in *Abelson's, Inc. v. N. J. State Bd. of Optometrists,* 5 *N. J.* 412 (1950), "rules and regulations and administrative action cannot subvert or enlarge upon the statutory policy or the rules and regulations therein set down. Administrative · implementation cannot deviate from the principle and policy of the statute." 5 *N. J.* at 424. *See also N. J. Chamber of Commerce v. N. J. Election Law Enforcement Comm'n,* 135 *N. J. Super.* 537, 550–51 (Ch. Div. 1975).

 *N. J. S. A.* 19:44–A–28 expressly provides that the "act shall apply to the general election campaign for the office of Governor to be held in November, 1977 . . . ." Since we now hold that *N. J. S. A.* 19:44A–29(b) was intended to prohibit all campaign contributions in excess of $600 during a general election, it follows that any candidate in the 1977 gubernatorial election is prohibited from receiving contributions in excess of $600 after June 7, 1977, the date of the gubernatorial primary.[3]

 Finally, intervenor argues that the Appellate Division's interpretation of the statute would violate constitutional guarantees. It points out that the act only limits campaign winners from receiving contributions in excess of $600 during the general election, leaving losers free to accept donations in any amount during the same period. This disparate treatment, it concludes, is irrational and thus violates equal protection principles.

---

[3] Our decision today does not unfairly prejudice the candidates in this election. The act became effective on May 6, 1974 and provided that it would be applied to the 1977 election. As a result, candidates cannot complain that they were led to believe that the statute would not be applied to this election.

The instant statute differs from that involved in *Buckley, supra*, in that it does not regulate campaign contributions which are made during the pendency of the primary. *See Buckley*, 424 *U. S.* at 24, 96 *S. Ct.* 612, 46 *L. Ed.* 2d at 691. Nevertheless, the Court's opinion there demonstrates the important interests served by a limit on campaign contributions. The Court opined:

It is unnecessary to look beyond the Act's primary purpose — to limit the actuality and appearance of corruption resulting from large individual financial contributions — in order to find a constitutionally sufficient justification for the $1,000 contribution limitation. Under a system of private financing of elections, a candidate lacking immense personal or family wealth must depend on financial contributions from others to provide the resources necessary to conduct a successful campaign. The increasing importance of the communications media and sophisticated mass-mailing and polling operations to effective campaigning make the raising of large sums of money an ever more essential ingredient of an effective candidacy. To the extent that large contributions are given to secure political quid pro quo's from current and potential office holders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem is not an illusory one.

Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions. * * * Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.' [*CSC v. Letter Carriers*, 413 *U. S.* 548, 565, 93 *S. Ct.* 2880, 2890, 37 *L. Ed.* 2d 796 (1973)].

[424 *U. S.* at 26–27, 96 *S. Ct.* at 638, 46 *L. Ed.* 2d at 692; footnotes omitted].

These same concerns underlie our own legislation, see *ante* at 239, and are sufficient to justify the Legislature's disparate treatment of winners and losers in primary elections. The statutory purpose of the legislation — to prevent the potential for undue influence — does not fall equally on primary winners and losers alike. Admittedly,

this legislation may not remove every possibility for improper influence upon a candidate.[4] Nevertheless, the fact that a candidate is no longer involved in an election eliminates or substantially reduces the possibility that he may be influenced in his official capacity by a campaign contribution in excess of $600. Recognizing the rigorous standard of review in such cases, *Buckley, supra,* 424 *U. S.* at 29, 96 *S. Ct.* 612, 46 *L. Ed.* 2d at 694, we conclude that the classification bears a real and substantial relation to the primary objective of the act. *Bullock v. Carter,* 405 *U. S.* 134, 144, 92 *S. Ct.* 849, 31 *L. Ed.* 2d 92, 100 (1972); *Robinson v. Cahill,* 62 *N. J.* 473, 492 (1972). Consequently, we conclude that it is constitutional.[5]

We therefore hold that:

(1) the regulation, *N. J. A. C.* 19:25–15.36, is invalid;

---

[4]For instance, it is possible for such improper influences to emerge if a candidate seeks office at some later date, or is currently in office and is willing to compromise his position by using his official status to "repay" campaign benefactors. While we do not in any way condone such practices, we note that the Legislature may attempt to regulate a given area without having to undertake a complete reform of all potential abuses. *See, e. g., Troy Hills Village v. Parsippany-Troy Hills Tp. Council,* 68 *N. J.* 604, 633 (1975); *N. J. Chapter, Am. I. P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581, 593 (1967), appeal dismissed and *cert.* den. 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed.* 2d 8 (1967); *Dandridge v. Williams,* 397 *U. S.* 471, 486–87, 90 *S. Ct.* 1153, 1162–63, 25 *L. Ed.* 2d 491, 502–03 (1970).

[5]We note that the Court in *Buckley* did not foreclose the possibility of raising a wholly distinct claim from that before us today. It stated that:

In this discussion, we address only the argument that the contribution limitations alone impermissibly discriminate against nonincumbents. We do not address the more serious argument that these limitations, in combination with the limitation on expenditures by individuals and groups, the limitation on a candidate's use of his own personal and family resources, and the overall ceiling on campaign expenditures invidiously discriminate against major-party challengers and minor-party candidates.

[424 *U. S.* at 31, n. 33, 96 *S. Ct.* at 640, n. 33, 46 *L. Ed.* 2d at 694, n. 33]

(2) *N. J. S. A.* 19:44A–29(b) prohibits all campaign contributions in excess of $600 to any candidate in the gubernatorial general election, regardless of whether it is intended to be used to pay primary debts;

(3) the $600 statutory limitation applies to all candidates, regardless of whether they elect to receive public funds;

(4) equal protection guarantees are not violated even though unsuccessful candidates in primary campaigns are not bound by the $600 limitation; and

(5) the provisions of *N. J. S. A.* 19:44A–27 *et seq.* apply to the November 1977 gubernatorial election.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER—6.

*For reversal*—None.