275 N.J. Super. 46 (1994)
645 A.2d 166
INDEPENDENT ENERGY PRODUCERS OF NEW JERSEY, APPELLANT,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY AND PUBLIC SERVICE ELECTRIC AND GAS COMPANY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1994.
Decided July 8, 1994.
*50 Before Judges PETRELLA, BAIME and CONLEY.
Mark L. First argued the cause for appellant (Reed, Smith, Shaw & McClay, attorneys; Mr. First, of counsel and on the brief; and Van Ness, Feldman & Curtis, attorneys; Peter L. Dickson, of counsel).
Gregory Eisenstark, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection & Energy (Deborah T. Poritz, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Eisenstark, on the brief).
Richard B. McGlynn argued the cause for respondent Public Service Electric and Gas Co. (LeBoeuf, Lamb, Greene & MacRae, attorneys; Mr. McGlynn, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
The Independent Energy Producers of New Jersey (IEPNJ), a trade association whose members are engaged in the construction and operation of non-utility generating plants, appeals from a decision of the Department of Environmental Protection and Energy (Department) granting an air pollution control permit to Public Service Electric and Gas Company (PSE & G) for the *51 repowering of its existing Bergen Generating Station and a conditional permit for the construction of a new facility at the same site. The principal question presented is whether PSE & G was required to obtain a certificate of need under the Electric Facility Need Assessment Act (N.J.S.A. 48:7-16 to -25) as a prerequisite to obtaining an air pollution control permit. We hold that a certificate of need was not required for the repowering phase of the project. However, we conclude that the Department erred by granting a conditional air pollution control permit for the construction of the new facility at the same site.

I.
The facts are not in dispute. On January 15, 1992, PSE & G filed an application for an air pollution control permit for its Bergen generating station project. The project consists of two phases. In Phase I, the existing 627 MW capacity plant will be repowered by replacing two steam generating units, each rated at 285 MW, with four combined-cycle natural gas turbines capable of producing 425 MW of power. An existing steam turbine will also produce power using steam recovered from gas turbines. So too, an existing generator will continue to produce 17 MW of power. The repowering phase of the project will increase the installed power of the existing plant from 627 MW capacity to 667 MW capacity. In Phase II, new combined-cycle capacity of approximately 650 MW will be added by constructing four additional combined-cycle turbines, with a similar routing of steam to a second existing steam turbine generator.
The existing Bergen generating station is located on a 110 acre site in Ridgefield, facing the Overpeck Creek to the north, the Hackensack River to the southwest, and the New Jersey Turnpike immediately to the east. IEPNJ does not dispute the fact that portions of the existing station are outdated and should be replaced with more efficient, state-of-the-art equipment. We note in that respect that the original plant was constructed in the 1950's. Replacement of the existing steam boilers with combustion gas *52 turbines will increase energy producing efficiency while substantially decreasing emission of pollutants into the atmosphere. In addition, Phase I will replace the existing oil tank with one less than half its size. Exhaust stacks will be 90 feet shorter than those in place. The existing "once-through cooling design" will be replaced with a "closed-loop" system, reducing the heat load to the surrounding water bodies by utilizing "wet-dry type mechanical-draft coolers." In short, the record contains overwhelming evidence that modernization of the existing station in Phase I will enhance its operational efficiency and will result in significant improvement in the environmental quality of the region.
If constructed, Phase II will consist of four additional gas turbine engines, with a combined total capacity of 650 MW. As noted earlier, there will be a similar routing of steam to a second existing steam turbine generator. If Phase II receives the requisite regulatory approvals and is constructed as planned, the total combined generating capacity of the Bergen station will be 1,300 MW.
The Department's initial review of PSE & G's permit application and related documentation lasted more than one year and was extremely thorough. On February 18, 1993, the Department issued a draft permit and, shortly thereafter, published notice of a public hearing. The hearing was conducted subsequently on March 18, 1993. IEPNJ did not appear at the public hearing, but filed written comments in which it stated its belief that the Electric Facility Need Assessment Act (EFNA) applied to the Bergen project and, therefore, a certificate of need was required. We will examine the requirements of EFNA in greater depth later in this opinion. Suffice it to say at this point that the statutory scheme bars a public utility from commencing construction of any electric facility without first obtaining a certificate of need. N.J.S.A. 48:7-19. The Act also prohibits a governmental agency from issuing any permit or license required for such construction or substantial expansion prior to issuance of a certificate of need. Ibid. EFNA defines an electric facility as (1) any electric generating *53 unit or combination of units at a single site with a combined production of 100 MW or more, or (2) any electric generating units added to an existing electric generating facility which will increase its installed capacity by 25% or by more than 100 MW. N.J.S.A. 48:7-18d(1) and (2). In its written comments, IEPNJ suggested that an inquiry should be conducted by way of a "declaratory ruling" under the Administrative Procedure Act (N.J.S.A. 52:14B-1 to -15). However, IEPNJ never specifically requested such a ruling. Nor did it file objections, questions or comments with regard to air emission parameters.
On May 27, 1993, the Department's hearing examiner issued a detailed report containing his findings on the Bergen station project and recommending changes in the permit conditions in response to the comments received. These revisions dealt solely with monitoring conditions for the cooling water and are not germane to this appeal. In response to IEPNJ's contention that a certificate of need was required under EFNA, the hearing examiner found that the two phases of the Bergen station project, although interrelated in certain aspects, were separate and distinct. In reaching this conclusion, the hearing examiner emphasized that Phase I of the project involved replacing and repowering the existing facility and was not contingent upon approval of Phase II. Because the net increase in the installed capacity of the existing plant was 40 MW, less than 100 MW or 25% of the station's current capacity, the hearing examiner concluded that Phase I did not require a certificate of need. In contrast, Phase II, if constructed, would have a generating capacity of 650 MW. The hearing examiner thus determined that a final air pollution control permit could not be issued for Phase II of the project until a certificate of need under EFNA was obtained. We quote the hearing examiner's report in part because of its critical importance to resolution of the issues raised:
Phase I consists of the conversion of three existing units which total 610 MW (unit #1 and Unit #2 steam generating units, each with a capacity of 285 MW, and Unit #4, with two combustion turbines, each with a capacity of 20 MW) to four new combustion turbines and two new cooling towers, which along with existing Unit *54 #1 steam turbine/generator condensers and auxiliary equipment, totals 650 MW. In addition to asbestos removal, the extent of the demolition or removal of the existing plant includes the No. 6 fuel oil tank and pipes, Unit 1 & 2 boilers, and Unit #4. The steam turbine building will remain standing except insofar as modification is needed to install the new equipment. Thus, the Department considers Phase I of this project to be replacement of the existing generation capacity within the limits imposed by the Act. The Act requires a certificate of need for "Any electric generating units added to an existing electric generating facility which will increase its installed capacity by 25% or by more than 100 megawatts whichever is smaller." N.J.S.A. 48:7-18-19. Here, an existing facility is being renovated in Phase-I which has the effect of increasing its capacity by 40 MW, less than both the triggering figures of 100 MW or 25% of installed capacity, here, 152.5 MW. It bears emphasis that the proposed Phase-II of this project with a generating capacity of 650 MW does require a certificate of need such that the issuance of this permit for Phase-I is in no manner contingent on approval of Phase-II.
Based upon the hearing examiner's report, the Department granted an air pollution control permit for Phase I. The Department found that the proposed facility was not a major modification of an existing major stationary source of air pollution as defined by 40 C.F.R. § 52.21(b)(1)(i) (1993) and that the substantive requirements of federal regulations did not apply because the contemplated emissions would be offset by creditable decreases. The Department's approval was contingent upon PSE & G's fulfillment of 21 conditions, four that must be met before Phase I begins operation and 17 thereafter.
The Department's disposition of the issues relating to Phase II was far more equivocal and has been characterized in different ways by the parties to this appeal. In its covering letter, the Department withheld "final determination" regarding Phase II until a certificate of need under EFNA is obtained. The Department's permit, however, added that the permit to construct Phase II will be "effective" after PSE & G obtains a certificate of need.
It is against this factual backdrop that we consider the issues presented.

II.
Preliminarily, we address questions pertaining to IEPNJ's standing to challenge the validity of the Department's determination. The issue is not free from doubt.
*55 Although there is no express language in New Jersey's Constitution similar to its federal counterpart that confines the exercise of judicial power to actual cases and controversies, compare U.S. Const., art. III, § 2 with N.J. Const., art. VI, § 1, our courts have long held that they will not entertain proceedings instituted by mere interlopers or strangers to the dispute. Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107, 275 A.2d 433 (1971); County of Bergen v. Port of New York Auth., 32 N.J. 303, 307, 160 A.2d 811 (1960); New Jersey Turnpike Auth. v. Parsons, 3 N.J. 235, 240, 69 A.2d 875 (1949); Baxter v. Baxter, 43 N.J. Eq. 82, 86, 10 A. 814 (Ch. 1887), aff'd, 44 N.J. Eq. 298, 18 A. 80 (E. & A. 1888). We have long recognized that "`our authority is confined to deciding questions presented in an adversary context in a form capable of resolution through the judicial process.'" In re Ass'n of Trial Lawyers of America, 228 N.J. Super. 180, 185, 549 A.2d 446 (App.Div.) (quoting State v. Jones, 198 N.J. Super. 553, 559-60, 487 A.2d 1278 (App.Div. 1985)), certif. denied, 113 N.J. 660, 552 A.2d 180 (1988). Entitlement to sue "requires a sufficient stake and real adverseness with respect to the subject matter of the litigation." New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 67, 411 A.2d 168 (1980). A substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for purposes of standing. Ibid. (citing Home Builders League, Inc. v. Township of Berlin, 81 N.J. 127, 134-35, 405 A.2d 381 (1979); Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151, 159 n. 3, 336 A.2d 713, appeal dismissed, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975)). While it is true that the standing of nonprofit associations, such as IEPNJ, has historically been upheld in New Jersey where they or their members suffer immediate or threatened injury as a result of a challenged action, see, e.g., Right to Choose v. Byrne, 91 N.J. 287, 313-15, 450 A.2d 925 (1982); Jordan v. Horsemen's Benevolent & Protective Ass'n, 90 N.J. 422, 431-32, 448 A.2d 462 (1982); Knight v. City of Margate, 86 N.J. 374, 380 n. 1, 431 A.2d 833 (1981); New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement *56 Comm'n, 82 N.J. at 67-69, 411 A.2d 168; Common Cause v. New Jersey Election Law Enforcement Comm'n, 74 N.J. 231, 235-36, 377 A.2d 643 (1977); American Trial Lawyers Ass'n v. New Jersey Supreme Court, 66 N.J. 258, 260, 330 A.2d 350 (1974); Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. at 105-12, 275 A.2d 433; New Jersey State Bar Ass'n v. Northern N.J. Mortgage Assocs., 22 N.J. 184, 196, 123 A.2d 498 (1956); Young v. Byrne, 144 N.J. Super. 10, 15-16, 364 A.2d 47 (Law Div. 1976); see also Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343, 361-62 (1975); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), we have refused to permit such suits where the representational interest asserted has been considered too ethereal to justify judicial recognition and acknowledgement, In re Ass'n of Trial Lawyers of America, 228 N.J. Super. at 187, 549 A.2d 446. It is certainly arguable that, as mere commercial competitors to PSE & G, the members of IEPNJ have only a speculative possibility of a business advantage in the outcome of this litigation, an interest so conjectural as to bar the association from attacking the Department's action.
Despite these reservations, we have decided to reach the merits of the substantive arguments advanced. In administrative law cases such as this, business entities competing with the prospective permittee may be the only institutions with sufficient private interest in harmony with the public concern of the consumer. See Elizabeth Fed. S. & L. Ass'n v. Howell, 24 N.J. 488, 501, 132 A.2d 779 (1957). If business competitors are not accorded standing in such cases, an administrative determination favorable to the permittee, whether right or wrong, proper or arbitrary, takes on a conclusive character "to the possible great detriment of the people as a whole." Id. at 501-02, 132 A.2d 779. Although IEPNJ's interest in the Department's determination may be considered speculative and likened to that of a spoiler, we are satisfied that the public interest will best be served by judicial resolution of the questions presented. See Associates in Radiation Oncology, P.A. v. Siegel, 272 N.J. Super. 208, 212-13, 639 A.2d *57 729 (App.Div. 1994); In re Valley Hosp., 240 N.J. Super. 301, 304-05, 573 A.2d 203 (App.Div. 1990), certif. denied, 126 N.J. 318, 598 A.2d 879 (1991); see also In re Waterfront Dev. Permit, 244 N.J. Super. 426, 437-38, 582 A.2d 1018 (App.Div. 1990), certif. denied, 126 N.J. 320, 598 A.2d 880 (1991).

III.
Initially, we discern no sound basis to disturb the Department's threshold finding that Phase I and Phase II of the Bergen station project constitute two distinct and separable events in determining the applicability of EFNA's certificate of need requirement. In reaching this conclusion, we emphasize the limited scope of our review powers. Although administrative agencies act either through rulemaking or adjudication, Texter v. Department of Human Servs., 88 N.J. 376, 383-84, 443 A.2d 178 (1982) (citing Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325, 338, 426 A.2d 1000 (Handler, J., concurring), appeal dismissed, 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981); Boller Beverages, Inc. v. Davis, 38 N.J. 138, 154, 183 A.2d 64 (1962)), "[the Department's] permitting process does not fit precisely into either category[,]" In re Issuance of a Permit, 120 N.J. 164, 171, 576 A.2d 784 (1990). In the context of PSE & G's application for an air pollution control permit, the Department's function was to "review evidence, make findings of fact, and exercise discretion in applying the law to those facts." Ibid. Our obligation is to determine whether the Department violated the enabling act's express or implied legislative policies, whether there was substantial evidence in the record to support the agency's findings and whether it clearly erred by reaching a conclusion that could not reasonably have been made after weighing the relevant factors. Non-Profit Affordable Housing Network v. New Jersey Council on Affordable Housing, 265 N.J. Super. 475, 479, 627 A.2d 1153 (App.Div. 1993); see also Williams v. Department of Human Servs., 116 N.J. 102, 107, 561 A.2d 244 (1989); Public Serv. Elec. and Gas Co. v. New Jersey Dep't of Envtl. Protection, 101 N.J. 95, *58 103, 501 A.2d 125 (1985). In exercising our review powers, we "must defer to [the] agency's expertise and superior knowledge [in its] particular field[,]" Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992), and accord its determination a "strong presumption of validity and reasonableness[,]" Van Dalen v. Washington Township, 120 N.J. 234, 244-45, 576 A.2d 819 (1990).
Within this analytical framework, there is ample evidence in the record warranting the Department's conclusion that the two phases of the project are distinct and severable. The principal thrust of Phase I is to upgrade PSE & G's existing plant capacity by replacing outmoded equipment with more efficient state-of-the-art machinery. As we will note later in this opinion, the replacement and repowering of the existing facility fall outside of the manifest language and intent of EFNA. In contrast, Phase II involves the construction of a related, but entirely new facility. This phase plainly falls within EFNA's certificate of need requirement. By arguing that PSE & G has irrationally divided the project to avoid EFNA's applicability, IEPNJ ignores the energy supply planning objectives underlying the decision to construct the plant in two separate phases. We find nothing in the record to suggest that PSE & G is seeking to evade EFNA's stringent requirements. It cannot fairly be said that the Department's decision violated statutory policy or that it was otherwise arbitrary or unreasonable.

IV.
We next consider whether a public utility's repowering of a facility falls within the purview of EFNA. We hold that EFNA does not apply to the replacement of existing capacity within the limits proposed by PSE & G at its Bergen plant. Specifically, we reject IEPNJ's argument that a utility's replacement of existing machinery with equipment having a generating capacity of 100 MW or more falls within the definition of N.J.S.A. 48:7-18d(1) *59 notwithstanding the fact that its installation does not enhance or increase its existing generating capacity by the statutory amount.
N.J.S.A. 48:7-19 provides that:
No public utility shall commence construction of any electric facility without having obtained from the department a certificate of need therefor as hereinafter provided. No agency of the State, or any county or municipal government, shall issue any license or permit required for any such construction or substantial expansion prior to the issuance of a certificate of need therefor by the department.
"Electric facility" is defined in N.J.S.A. 48:7-18d(1) and (2) as:
(1) Any electric power generating unit or combination of units at a single site with a combined production of 100 megawatts or more and any facilities appurtenant thereto; or
(2) Any electric generating units added to an existing electric generating facility which will increase its installed capacity by 25% or by more than 100 megawatts, whichever is smaller.
Therefore, in determining whether EFNA is applicable to an electric utility construction project, the Department must decide whether the planned project is within the confines of the N.J.S.A. 48:7-18d definition.
We are convinced that in so defining the term "electric facility[,]" and hence the scope of EFNA, the Legislature intentionally created two separate categories. More specifically, N.J.S.A. 48:7-18d(1) was intended to cover utility construction of a new facility that did not exist beforehand. In contrast, N.J.S.A. 48:7-18d(2) was designed to cover additions to existing facilities which yield substantially greater generating capacity. If, as IEPNJ contends, N.J.S.A. 48:7-18d(1) was intended to encompass additions to existing facilities or replacement of existing generating capacity, the Legislature would have had no need to establish separate, alternative definitions. Rather, the second definition would be subsumed within the first. IEPNJ's interpretation of the statute effectively renders the second definition meaningless and nugatory, contrary to the established proposition that "`legislative language must not, if reasonably avoidable, be found to be inoperative [or] superfluous.'" In re Sussex County Mun. Utils. Auth., 198 N.J. Super. 214, 217, 486 A.2d 932 (App.Div.) (quoting Board of Educ. v. City of Hackensack, 63 N.J. Super. 560, 569, 165 A.2d 33 (App.Div. *60 1960)), certif. denied 101 N.J. 267, 501 A.2d 934 (1985); see also Calabro v. Campbell Soup Co., 244 N.J. Super. 149, 164, 581 A.2d 1318 (App.Div. 1990), aff'd, 126 N.J. 278, 597 A.2d 83 (1991).
Moreover, other sections of EFNA provide additional evidence that the Legislature intended to distinguish between construction of entirely new facilities and expansions of existing generating capacity. In its articulated findings, the Legislature noted its concern with "construction of new electric generation facilities[] or substantial expansion of existing facilities[]" that might "bring[] electric generation capacity to a level significantly in excess of what will be required[,]" thereby "impos[ing] a substantial and unreasonable financial burden on the ratepayers in the franchise area." N.J.S.A. 48:7-17. In a similar vein, N.J.S.A. 48:7-19 states that "[n]o agency of the State, or any county or municipal government, shall issue any license or permit required for any such construction or substantial expansion prior to the issuance of a certificate of need." The distinction between the construction of entirely new facilities and the construction of substantial additions to existing facilities permeates the statutory scheme.
The statutory language thus indicates that the types of utility construction the Legislature wished to subject to prior approval were capacity additions, either by way of new plant development or substantial enhancement of existing facilities. Our interpretation of the Act is also bolstered by the Senate Energy and Environment Committee's statement to the EFNA bill which distinguishes between the construction of new plants and the expansion of existing ones. In the Statement, the Committee noted "[EFNA] require[s] electric utility companies to obtain a certificate of need ... prior to the construction of a new electric generating plant or the substantial expansion of an existing one." Senate Energy and Environment Committee's Statement to S. 975 (1982). The distinction is also reflected in the Statement of the Sponsors of the bill, which says that the proposed legislation requires a utility to obtain a certificate of need *61 "before embarking on the construction of any major electric generation facility or significant expansion of an existing facility." Sponsors' Statement to S. 975 (1982).
Strong public policy concerns that underlie the legislation also militate in favor of our construction of the Act. A utility's ability to freely repair, replace or improve its existing facility is to the public advantage and would be stymied if it were required to comply with EFNA. If IEPNJ were to prevail in this appeal, every electric utility would be required to obtain a certificate of need before it began a construction project to upgrade or replace any existing generating unit of 100 MW or more. Although there has never been a certificate of need proceeding, even a cursory glance at EFNA's stringent requirements discloses it will be time consuming and expensive. If IEPNJ were correct in its arguments here, the cost of upgrading existing generating plants, both in terms of dollars and resource planning flexibility, would increase dramatically. Although this might make power purchases from IEPNJ's members more attractive, it would not serve the interests of the consumer. Most importantly, we find no evidence in the statutory language or EFNA's history suggesting that the Legislature intended to make a utility's repairs or improvements which yield less than the threshold capacity levels set forth in the statute subject to prior approval.
We recognize that EFNA was enacted in response to a number of abandoned electric utility construction projects in the 1970's and early 1980's. One of the major legislative concerns was that utility ratepayers were being saddled with the costs of these failed projects. Clearly, the broad intent of EFNA was to establish an administrative mechanism to review both the need and cost aspects of constructing new generating plants or significantly expanding existing ones. We acknowledge that the cost of renovation, repair or replacement work may be as great as the expense of constructing an entirely new plant. However, this concern, though rooted in reality, does not permit us to transmogrify the statutory language. The Legislature could have enacted a certificate of need requirement for all construction, including renovation, *62 repair and replacement of existing equipment.[1] It also could have established a cost threshold for the requirement of obtaining a certificate of need.[2] The simple and overriding fact is that the Legislature chose neither course. Instead, it provided a clear and discernible megawattage threshold as a prerequisite to the certificate of need requirement. We read and apply the statute as written.
We thus conclude that it was not the intent of EFNA to compel utilities to re-establish the need for existing capacity. Instead, EFNA applies only to the construction of new plants producing 100 MW or more and to expansion of existing plants yielding more than 100 MW or 25% of existing capacity. Because Phase I will increase the generating capacity of the existing Bergen station by less than 100 MW or 25% of its current power, we agree with the Department's determination that a certificate of need was not required.

*63 V.
As we said earlier, the Department's disposition of PSE & G's request for a permit for Phase II is subject to varying interpretations. Although the Department's covering letter clearly indicated that construction of Phase II could not commence until PSE & G obtains a certificate of need under EFNA, the permit issued is susceptible to an interpretation that no further review of air emission parameters will be required. Because we view Phase I and Phase II as distinct events for the purpose of applying EFNA, it follows that they should have been licensed separately. In other words, PSE & G should not be allowed to "grandfather" or bank an air pollution control permit for Phase II. Instead, the Department should review anew PSE & G's application for an air pollution control permit after the utility has obtained a certificate of need under EFNA.
The result we reach is clearly required by N.J.S.A. 48:7-19, which states unequivocally that no governmental agency "shall issue any license or permit required for [construction of a new facility or substantial expansion of an exiting one] prior to the issuance of a certificate of need." As we pointed out previously, a certificate of need proceeding under EFNA will be time-consuming. Applicable air pollution regulations may become more restrictive in the interim. We are convinced that a conditional permit which becomes effective when a certificate of need is obtained evades the statutory prohibition and subverts the legislative intent.

VI.
IEPNJ raises a plethora of additional issues that it did not present in its comments to the Department. It is axiomatic that our review is restricted to the administrative record and to the issues raised before the administrative agency. Bergen Pines County Hosp. v. New Jersey Dep't of Human Servs., 96 N.J. 456, 474-76, 476 A.2d 784 (1984). We do not address these additional questions.
*64 The determination of the Department is affirmed in part and reversed in part. The matter is remanded to the Department for modification of the permit to indicate that it applies only as to Phase I.
NOTES
[1] Thirty-seven other states impose a certification or approval process before an electric utility can commence construction or operation of an electric facility. See generally Samuel H. Porter & John R. Burton, Legal and Regulatory Constraints on Competition in Electric Power Supply, 123 No. 11 PUB.UTIL.FORT. 24 (1989). Of these, thirty-one do not impose threshold requirements of total combined production or a percentage increase of installed capacity as does New Jersey. See N.J.S.A. 48:7-18d. On the other hand, six states do impose threshold requirements similar to N.J.S.A. 48:7-18d(1). See Iowa Code Ann. §§ 476A.1 and 476A.2 (West 1993) (requiring certification for the construction of a facility with a total capacity of 25 MW or more); Me. Rev. Stat. Ann. tit. 35-A, § 3132 (West 1993) (requiring certification for the construction of a facility with a total capacity of 1,000 kilowatts or more); Minn. Stat. Ann. § 216B.24 (West 1993) (requiring certification for the construction of a facility with a total capacity of 50 or more MW); S.C. Code Ann. §§ 58-33-20 and XX-XX-XXX (Law.Co-op. 1991) (requiring certification for the construction of a facility with a total capacity of more than 75 MW); Va. Code Ann. § 56-234.3 (Michie 1993) (requiring certification for the construction of a facility with a total capacity of 100 MW or more); Wis. Stat. Ann. § 196.491 (West 1993) (requiring certification for the construction of a facility with a total capacity of 12,000 kilowatts or more).
[2] No state has set a capital outlay threshold, but Utah does require that a utility be "financially stable" before applying for a certificate of need. Utah Code Ann. § 54-4-25(4) (Michie 1993).