791 A.2d 1085 (2002)
348 N.J. Super. 272
COALITION FOR QUALITY HEALTH CARE, Physicians Union of New Jersey, Local Lodge 8, New Jersey Association of Osteopathic Physicians and Surgeons, Association of Trial Lawyers of America-New Jersey, and Richard Callahan, Plaintiff-Appellants,
v.
NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE, Division of Insurance, Defendant-Respondent,
and National Association of Independent Insurers, American Insurance Association, Insurance Council of New Jersey, and Alliance of American Insurers, Respondents-Intervenors.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 2002.
Decided March 4, 2002.
*1089 Richard Wildstein, Passaic, argued the cause for appellants (Goldstein, Ballen, O'Rourke & Wildstein, and Sagot, Jennings & Sigmond, attorneys; Richard Wildstein and James Katz, on the brief).
Doreen J. Piligian, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Jr., Attorney General, attorney; Nancy Kaplan, Assistant Attorney General, of counsel; Ms. Piligian, on the brief).
Thomas P. Weidner, Princeton, argued the cause for intervenors (Windels, Marx, *1090 Lane & Mittendorf, attorneys; Mr. Weidner, of counsel and on the brief; David F. Swerdlow, Elizabeth J. Boyd, and Michael J. Canavan, on the brief).
Gerald H. Baker, Hoboken, argued the cause for amicus curiae New Jersey State Bar Association (Barry D. Epstein and Baker, Garber, Duffy & Pedersen, attorneys; Mr. Baker, on the brief).
Before Judges CONLEY, A.A. RODRIGUEZ and LISA. *1086 *1087
*1088 The opinion of the court was delivered by LISA, J.A.D.
In this case we consider the validity of approvals issued by the Commissioner of the Department of Banking and Insurance (Commissioner/DOBI) to precertification plans and policy forms of various insurers under the provisions of the Automobile Insurance Cost Reduction Act, L. 1998, c. 21 (AICRA) and regulations promulgated by the DOBI under AICRA. Appellants challenge the precertification plans on both procedural and substantive grounds. The challenges to the policy forms implicate provisions that establish copaymente for certain diagnostic testing services but waive copayment if the insurance company's approved network is utilized, that compel submission of personal injury protection (PIP) disputes to dispute resolution, and that place restrictions on the assignment of PIP benefits. A challenge is also made to the DOBI's approval of a tier rating system that allows consideration of payment of PIP benefits arising out of a non-fault accident in charging a higher premium. We affirm the challenged actions of the DOBI and its Commissioner. However, we remand on the issue of care path diagnostic tests, noting they do not require precertification, and directing the DOBI to review the provisions in all approved plans and policies to assure their correctness and clarity in this regard and to require any modifications as may be necessary.
Appellants represent health care providers and attorneys, who contend, generally, that the asserted unlawful actions of the DOBI will adversely affect claimants injured in automobile accidents and their health care providers. Appellant Richard Callahan is an Allstate insured who presents the tier rating challenge. Amicus curiae, New Jersey State Bar Association, supports appellants' position. Although the individual insurance companies whose plans and policies are affected were served with the notice of appeal, none have participated in the proceedings before us. Their interests are represented, however, by the intervenors, National Association of Independent Insurers, American Insurance Association, Insurance Council of New Jersey, and Alliance of American Insurers.
The DOBI asserts that appellants lack standing to challenge the Commissioner's approval of the individual insurance company policy forms. Rule 4:26-1 provides that "[e]very action may be prosecuted in the name of the real party in interest...." "Standing `refers to the plaintiff's ability or entitlement to maintain an action before the court.'" In re Baby T., 160 N.J. 332, 340, 734 A.2d 304 (1999) (quoting New Jersey Citizen Action v. Riviera Motel Corp., 296 N.J.Super. 402, 409, 686 A.2d 1265 (App.Div.), certif. granted, 152 N.J. 13, 702 A.2d 352 (1997), appeal dismissed as moot, 152 N.J. 361, 704 A.2d 1297 (1998)).
"Entitlement to sue requires a sufficient stake and real adverseness with respect to the subject matter of the litigation... [and][a] substantial likelihood of some harm." Ibid. (citation omitted). "Standing has been broadly construed in New Jersey as `our courts have considered the threshold for standing to be fairly low.'" Triffin v. Somerset Valley *1091 Bank, 343 N.J.Super. 73, 81, 777 A.2d 993 (App.Div.2001) (quoting Reaves v. Egg Harbor Tp., 277 N.J.Super. 360, 366, 649 A.2d 904 (Ch.Div.1994)). Moreover, "[w]here the public interest is involved, only a slight additional private interest is necessary to confer standing." Jersey Shore Med. Center-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144, 417 A.2d 1003 (1980). However, "[o]rdinarily, a litigant may not claim standing to assert the rights of a third party." Ibid.
Appellants are legal and medical professionals representing and treating automobile accident victims. The manner of treatment and compensation for care of such individuals is impacted by the Commissioner's approval of the policies. Moreover, even if appellants' interests are somewhat attenuated, in light of the importance of the issues, and the interests of the organizations' members, we are satisfied that appellants have standing to challenge approval of the policies. See Independent Energy Producers of N.J. v. N.J. Dep't of Envtl. Prot. and Energy, 275 N.J.Super. 46, 56, 645 A.2d 166 (App.Div.) ("Although [appellant's] interest in the [agency's] determination may be considered speculative and likened to that of a spoiler, we are satisfied that the public interest will best be served by judicial resolution of the questions presented"), certif. denied, 139 N.J. 187, 652 A.2d 175 (1994).

I
In 1972 New Jersey enacted its first "no-fault" automobile law, the New Jersey Automobile Reparation Reform Act. N.J.S.A. 39:6A-1 to -35. This law provided for mandatory PIP benefits, payable without regard to fault. N.J.S.A. 39:6A-4; New Jersey Coalition of Health Care Professionals, Inc. v. N.J. Dep't of Banking and Ins., Div. of Ins., 323 N.J.Super. 207, 215-16, 732 A.2d 1063 (App.Div.), certif. denied, 162 N.J. 485, 744 A.2d 1208 (1999). Its goal was to compensate a larger class of citizens than the traditional tort-based system, with "greater efficiency" and at a lower premium cost. Id. at 216, 732 A.2d 1063 (quoting Emmer v. Merin, 233 N.J.Super. 568, 572, 559 A.2d 845 (App. Div.), certif. denied, 118 N.J. 181, 570 A.2d 950 (1989)). Inherent in the no-fault system was a limitation on conventional tort-based personal injury lawsuits. Ibid.
However, automobile insurance premiums continued to rise. In the succeeding twenty-six years, the Legislature adopted numerous provisions in an attempt to reduce insurance rates within the no-fault system. Ibid. For example in 1983, the Legislature enacted the "New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act" which introduced the concept of tort options and the choice between monetary thresholds for soft-tissue injuries. Ibid.; N.J.S.A. 39:6A-8(a) (repealed 1988). In 1988, the Legislature replaced the monetary threshold with a newly defined "verbal threshold," and added a $250 medical deductible, and a 20% copayment for some medical expenses. New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 217, 732 A. 2d 1063; Oswin v. Shaw, 250 N.J.Super. 461, 464, 595 A.2d 522 (App.Div.1991), aff'd, 129 N.J. 290, 609 A.2d 415 (1992). And in 1990 the Legislature enacted the "Fair Automobile Insurance Reform Act" (FAIRA), N.J.S.A. 17:33B-1 to -63, which provided, among other reforms, for a maximum payment of $250,000 per person per accident for reasonable medical expenses, an option to make the insured's health insurance the primary source for payment of medical and hospital expenses, and a revision of the medical fee schedule provisions. New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 217, 732 A.2d 1063.
These reforms, however, were not successful, and in 1998 the Legislature enacted *1092 AICRA, which made further comprehensive changes to the no-fault automobile insurance laws in an effort to "preserve the no-fault system, while at the same time reducing unnecessary costs" which had resulted in increased premiums. N.J.S.A. 39:6A-1.1b. The Legislature found that although New Jersey's no-fault law had "provided valuable benefits in the form of medical benefits,"
[s]ince the enactment of the verbal threshold in 1988, the substantial increase in the cost of medical expense benefits indicates that the benefits are being overutilized for the purpose of gaining standing to sue for pain and suffering, thus undermining the limitations imposed by the threshold and necessitating the imposition of further controls on the use of those benefits, including the establishment of a basis for determining whether treatments or diagnostic tests are medically necessary....

[Ibid.]
The Legislature recognized that "in order to keep premium costs down, the cost of the benefit must be offset by a reduction in the cost of other coverages, most notably a restriction on the right of persons who have non-permanent or non-serious injuries to sue for pain and suffering." Ibid. In addition, the Legislature found that fraud, stemming from unnecessary medical treatments and the overutilization of medical services and diagnostic tests used to satisfy the verbal threshold, combined with an arbitration system that did not effectively eliminate payment for unnecessary treatment and tests, had directly contributed to New Jersey's high insurance costs. Ibid. The Legislature compelled an overall 15% premium cost reduction, and a 25% PIP cost reduction. N.J.S.A. 17:29A-51.
To facilitate those reductions, AICRA substantially revised the process for resolving disputed PIP claims, and amended the mandatory PIP coverages to provide for treatment in accordance with protocols, or care paths, and for the precertification of certain medical procedures, treatments, tests or other services. N.J.S.A. 39:63.1,-4, and -5.1.
The Legislature directed that plans for protocols, or care paths, be submitted to the Commissioner for approval, and that
[t]he policy form ... shall set forth the benefits provided under the policy, including eligible medical treatments, diagnostic tests and services as well as such other benefits as the policy may provide. The commissioner shall set forth by regulation a statement of the basic benefits which shall be included in the policy. Medical treatments, diagnostic tests, and services provided by the policy shall be rendered in accordance with commonly accepted protocols and professional standards and practices which are deemed to be commonly accepted as being beneficial for the treatment of the covered injury. Protocols and professional standards and practices which are deemed to be commonly accepted pursuant to this section shall be those recognized by national standard setting organizations, national or state professional organizations of the same discipline as the treating provider, or those designated or approved by the commissioner in consultation with the professional licensing boards in the Division of Consumer Affairs in the Department of Law and Public Safety. The commissioner, in consultation with the Commissioner of the Department of Health and Senior Services and the applicable licensing boards, may reject the use of protocols, standards and practices or lists of diagnostic tests set by any organization deemed not to have standing or general recognition by the provider community or the applicable licensing *1093 boards. Protocols shall be deemed to establish guidelines as to standard appropriate treatment and diagnostic tests for injuries sustained in automobile accidents, but the establishment of standard treatment protocols or protocols for the administration of diagnostic tests shall not be interpreted in such a manner as to preclude variance from the standard when warranted by reason of medical necessity.

[N.J.S.A. 39:6A-3.1a (the basic plan).][1]
With regard to precertification, the Legislature directed that
[t]he policy form may provide for the precertification of certain procedures, treatments, diagnostic tests, or other services or for the purchase of durable medical goods, as approved by the commissioner, provided that the requirement for precertification shall not be unreasonable, and no precertification requirement shall apply within ten days of the insured event. The policy may provide that certain benefits provided by the policy which are in excess of the basic benefits required by the commissioner to be included in the policy may be subject to reasonable copayments in addition to the copayments provided for herein, provided that the copayments shall not be unreasonable and shall be established in such manner [as not] to serve to encourage underutilization of benefits subject to the copayments, nor encourage overutilization of benefits.

[Ibid.][2]
To facilitate implementation of these reforms the Legislature granted the Commissioner broad powers to "promulgate any rules and regulations ... deemed necessary in order to effectuate the provisions of this ... act." N.J.S.A. 39:6A-1.2.
Thereafter, on November 30, 1998, in accordance with its delegated authority, the DOBI adopted N.J.A.C. 11:3-4 (Personal Injury Protection Benefits; Medical Protocols; Diagnostic Tests) and N.J.A.C. 11:3-5 (Personal Injury Protection Dispute Resolution). The regulations establish a series of medical protocols or care paths as the standard course of "medically necessary treatment" for certain soft tissue injuries of the neck and back ("identified injuries," N.J.A.C. 11:3-4.2), N.J.A.C. 11:3-4.6(a), "injuries which the DOBI thought were fraught with potential for unnecessary treatment and overutilization of benefits." New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 223, 732 A.2d 1063. These medical protocols or care paths were adopted with the assistance of a health-benefits consultant and an ad hoc committee of the professional boards. Id. at 224, 732 A.2d 1063. "The care paths use a flow-chart method which presents a diagrammatic view of expected treatment patterns based on patient symptoms and objective evaluations by practitioners .... [and] contain projected utilization norms for assessing intensity and length of treatment." Id. at 223, 732 A.2d 1063, See N.J.A.C. 11:3-4, Appendix. The care path regulations thus establish typical courses of treatment for certain common automobile-related injuries and serve as standards for measuring medical necessity, but do not "prescribe a course of conduct for a particular patient." New Jersey Coalition *1094 of Health Care, supra, 323 N.J.Super. at 224, 732 A.2d 1063. Treatments that vary from the care paths are "reimbursable only when warranted by reason of medical necessity." N.J.A.C. 11:3-4.6(c).
Decision point review occurs at certain junctures during the treatment, as designated in the care paths, and may require a second opinion, development of a treatment plan, or case management. N.J.A.C. 11:3-4.6(b). Decision point is defined as "those junctures in the treatment of identified injuries where a decision must be made about the continuation or choice of further treatment .... [and] tests." N.J.A.C. 11:3-4.2. The failure to comply with decision point review procedures may result in additional copayments not to exceed 50%; however, such review does not require an affirmative response by the insurer and failure by an insurer to respond to notice of a proposed course of care path treatment, indicates that the treatment may continue. N.J.A.C. 11:3-4.7(b)3; New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 225-26, 732 A.2d 1063.
In contrast, precertification is defined as "a program, described in policy forms in compliance with these rules, by which the medical necessity of certain diagnostic tests, medical treatments and procedures are subject to prior authorization, utilization review and/or case management." N.J.A.C. 11:3-4.2. The regulations for precertification adopted by the DOBI which were in effect when the actions under review occurred (N.J.A.C. 11:3-4.8(a)) provided that "[i]nsurers may file for approval policy forms that provide for a precertification of certain medical procedures, treatments, diagnostic tests, or other services, non-medical expenses and durable medical equipment by the insurer or its designated representative." New Jersey Coalition Health Care, supra, 323 N.J.Super. at 283, 732 A.2d 1063 (Appendix). Subsequent to the disputed actions and the filing of this appeal, that section was amended to provide that "[i]nsurers may require precertification of certain specific medical procedures, treatments, diagnostic tests, other services and durable medical equipment that are not subject to decision point review and that may be subject to overutilization." N.J.A.C. 11:3-4.8(a)(emphasis added). A new section was added which provides that "[p]recertification requirements shall be included with a decision point review plan submission but the medical procedures, treatments, diagnostic tests, durable medical equipment or other services that require precertification shall be identified separately from decision point review." N.J.A.C. 11:3-4.8(b).
Under the earlier and amended versions, these regulations prohibit a precertification requirement within ten days of the insured event, N.J.A.C. 11:3-4.8(c), require that precertification be based exclusively on medical necessity and not encourage over or under utilization of the treatment or test, N.J.A.C. 11:3-4.8(d), allow a requirement that injured persons obtain durable medical equipment directly from the insurer or its designee, N.J.A.C. 11:3-4.8(g), and authorize inclusion in policy forms of an additional co-payment not to exceed 50% of the eligible charge for medically necessary tests, treatments, surgery, durable medical equipment and non-medical expenses for non-compliance with precertification requirements. N.J.A.C. 11:3-4.8(h).
Appellants do not appeal the regulations. In neither version did the DOBI specifically designate which procedures, services, or treatments could be subject to precertification.[3]

*1095 II
Against this background, we consider the precertification issues raised by appellants. Appellants' initially attack the DOBI's approval of precertification plans on procedural grounds, asserting that in the approval process the DOBI issued and distributed an administrative rule in violation of the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -24. Substantively, appellants challenge various provisions in the precertification plans. They contend the plans are overly broad, encompassing within their scope the equivalent of all medical treatment and testing, they impermissibly equate decision point review with precertification, and they impermissibly require precertification for care path diagnostic tests. Our analysis requires that we first recount the events culminating in the Commissioner's approval of the disputed precertification plans and policy provisions.

A
In March and April 1999, the DOBI reviewed and approved decision point review and precertification plans submitted by five insurers: Allstate; Prudential Insurance Company (Prudential); State Farm Insurance Company (State Farm); First Trenton Indemnity Company (First Trenton); and Palisades Safety and Insurance Association (Palisades). These plans required precertification for virtually all PIP medical care. For example, Allstate required "precertification for all services, treatments and procedures, diagnostic tests, prescription supplies, durable medical equipment or otherwise potentially covered medical expense benefits."
On May 3, 1999, the Commissioner issued Bulletin No: 99-07, suspending those approvals, stating that the DOBI had
received and reviewed a number of precertification plan filings pursuant to [AICRA] and the Department's rules ... and has determined it is necessary to develop additional standards for approval of these plans.
This bulletin is intended to advise insurers that additional standards will be promulgated in the near future, which will require revisions to the documents submitted to the Department and to the procedures implementing the plans.
Some insurers have undertaken to precertify all, or virtually all, medical care provided to injured motorists either by designating in the plan that all medical treatment must be precertified or by including an exhaustive list of treatments or procedures for which precertification is required. I am not authorizing the approval of such broad precertification plans, and the precertification plans already approved with overly broad precertifications requirements are suspended and must be revised and refiled.
More precise standards for the approval of precertification plans will be promulgated by the Department shortly. In the meantime, insurers with already approved plans should prepare to promptly file amendments to your plans upon receipt of the revised standards
Meanwhile, in 1998 the appellants in this case, among others, challenged the DOBI's adoption of N.J.A.C. 11:3-4 and -5. New Jersey Coalition of Health Care, supra, *1096 323 N.J.Super. at 214-15, 732 A.2d 1063. We issued our opinion in that case on June 14, 1999, upholding the validity of all of the challenged regulations except one not relevant here). Id. at 215, 732 A.2d 1063. We held that
[t]he establishment of standard treatments and diagnostic tests established in N.J.A.C. 11:3-4 are consistent with the legislative intent to discourage the performance of unnecessary medical services. The regulations are designed to provide all necessary medical care to those injured accident victims in need of treatment. They neither deny patients access to care nor interfere with physicians' ability to practice medicine. What the regulations do, however, consistent with AICRA's objective, is to establish meaningful standards against which to measure the reimbursement of medical treatments and diagnostic tests. We conclude the regulations are authorized by AICRA's plain language and consistent with the legislative intent.

[Id. at 239, 732 A.2d 1063.]
We further held that
[t]he establishment of basic benefits, standard treatment protocols and diagnostic tests, provided for in N.J.A.C. 11:3-4, is expressly authorized by AICRA. Not only is N.J.A.C. 11:3-4 authorized by the plain language of AICRA, it rationally serves the legislative public policy of ensuring that medically necessary care is reimbursed while placing limitations on medically unnecessary treatments and diagnostic testing; this will result in lower insurance premiums for New Jersey consumers. Appellants' criticisms of the care paths fall short of overcoming the presumption of validity and reasonableness accorded to the Department's regulations.

[Id. at 253-54, 732 A.2d 1063.]
We did not, however, address the precertification regulations, in light of the Commissioner's decision, expressed in Bulletin 99-07 (issued nine days prior to oral argument), to withdraw her earlier approval of certain plans and to "reconsider these procedures before issuing new directives or regulations on precertification of treatment or tests." Id. at 223, 732 A.2d 1063.
In July 1999, the DOBI issued a short guideline memorandum, developed in the course of its ongoing discussions with insurance companies, intended to serve as guidance to insurers of acceptable uses for a pre-certification program. The guideline provided that the DOBI would approve of plans requiring precertification of: 1) tests and procedures identified in N.J.A.C. 11:3-4.5(b)[4] (diagnostic tests) as acceptable for use in certain circumstances; 2) non-emergency surgical procedures; and 3) "other services and supplies," including home health care, skilled nursing care, non-emergency hospital care, infusion therapy, and durable medical equipment priced over a stated dollar amount.
However, the DOBI cautioned that the
[m]andated use of pre-certification, in connection with medical treatment of injuries addressed in the Department's care paths is problematic. Decision point review already sets the manner in which treating practitioners must interact with an insurer or its representatives.

*1097 Pre-certification of an entire course of treatment involving care paths can be voluntary. No penalty co-payments should be imposed during the period of insurer review, outside examination or until a determination is communicated, while treatment may continue uninterrupted pursuant to decision point review and the care paths.
Pre-certification may also be identified for use as a tool to monitor overutilization of treatment of injuries outside of care paths. The plan should not, however, be structured too broadly. It should be limited to the kinds of injuries or treatments that are subject to overutilization. But again, the program should not be structured to interrupt care, nor to impose penalty co-payments for treatments generally unless and until approved by insurer or its representative. To apply penalty co-payments, specific treatments, services or diagnostic tests must be identified in order for the Department to assess the reasonable use of the proposed pre-certification program.
In the summer of 1999, insurers began to submit to the DOBI revised decision point review and precertification plans for approval. At that time the DOBI engaged in considerable dialogue with Parkway Insurance Company (Parkway) and Parkway's vendor, regarding its plan. The DOBI approved Parkway's plan on August 19, 1999.
The approved Parkway plan provided that decision point reviews were to occur at various stages during the standard course of treatment of soft tissue injuries of the neck and back, as designated in the care paths. In contrast, precertification was required only for certain non-care path treatments, including: 1) non-emergency hospital admissions and confinement (to include the appropriateness and duration of the hospital stay); 2) non-emergency surgery; 3) durable medical equipment costing greater than $50, or rental greater than thirty days; 4) extended care and rehabilitation; 5) home health care; 6) hospice care; 7) infusion therapy; 8) prosthetic devices; 9) non-emergency mental health services; 10) physical, occupational, speech, or other restorative therapy; 11) non-care path pain management services; and 12) non-emergency dental restoration. Precertification was also required for the diagnostic tests listed in N.J.A.C. 11:3-4.5. Care path injuries, treatment or tests rendered during emergency care, and treatment within ten days following an accident were not subject to precertification. Failure to comply with the precertification and decision point review requirements would result in an additional 50% copayment.
In the event a request for precertification was denied, the Parkway policy provided that a medical provider could request reconsideration by a physician advisor, and if unsuccessful, submit the case for appeal to dispute resolution. The policy also provided for the assignment of benefits to a medical provider, but required that the provider "hold harmless the insured and the Carrier for any reduction of benefits caused by [their] failure to comply with the terms of the Decision Point/Precertification plan."
The Parkway plan provided additional copayments for: 1) diagnostic imaging and electrodiagnostic testing (30% per person per service); 2) durable medical equipment (30% per person per service); 3) prescription drugs ($10 per prescription); and 4) all other medical services (20% per accident up to $5000). However, that copayment was waived if the insured used "the voluntary utilization network."
Upon finalization and approval of Parkway's plan, the DOBI redacted the name of the company and vendor, and distributed *1098 it to insurance companies that were in the process of formulating plans as a "Sample Acceptable Decision Point Review/Precertification Plan Layout" (sample). The sample included decision point review, mandatory precertification, the appeals process, voluntary network services, and assignment of benefits.
Thereafter, the DOBI individually reviewed, and eventually approved, decision point review and precertification plans submitted by approximately twenty other insurance companies. Some of these policies are substantially similar or identical to the sample plan, while others contained varied provisions.[5]

B
Appellants contend the precertification portion of the DOBI's sample constitutes an administrative rule, adopted in violation of the procedural requirements of the APA, and is therefore invalid and requires invalidation of plans and policy forms approved in conjunction with it. We reject this contention.
"Where a legislative body establishes basic policy in its enabling statute, it may grant broad authority to an administrative agency to make rules and regulations to effectuate those policies." New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 228, 732 A.2d 1063. "[T]he grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and ... courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978).
Agencies are accorded "wide latitude in improvising appropriate procedures *1099 to effectuate their regulatory jurisdiction." Metromedia, Inc. v. Dir. Div. of Tax., 97 N.J. 313, 333, 478 A.2d 742 (1984). "[A]dministrative agencies possess the ability to be flexible and responsive to changing conditions." In re Pub. Serv. Elec. and Gas Co. Rate Unbundling, 167 N.J. 377, 385, 771 A.2d 1163 (2001) (citation omitted). "This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy." Ibid. In that regard, "[a]n agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty...." Northwest Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 137, 770 A.2d 233 (2001).
However, the manner in which the agency exercises its discretion in choosing an appropriate procedure may be governed by the procedural requirements of the APA. Id. at 137, 770 A.2d 233; Metromedia, supra, 97 N.J. at 333-34, 478 A.2d 742; St. Barnabas Med. Ctr. v. N.J. Hosp. Rate Setting Comm'n, 250 N.J.Super. 132, 142, 593 A.2d 806 (App.Div.1991). Thus if an agency's action constitutes a rule, it must comply with the APA requirements of notice and opportunity for comment. N.J.S.A. 52:14B-4(a)(1), (2); Woodland Private Study Group v. State, Dep't of Envtl. Prot., 109 N.J. 62, 63-64, 533 A.2d 387 (1987). The purpose of the notice requirement is "to give those affected by the proposed rule an opportunity to participate in the rule-making process not just as a matter of fairness but also as `a means of informing regulators of possibly unanticipated dimensions of a contemplated rule.'" In re Adoption of Regulations Governing Volatile Organic Substances in Consumer Prods., N.J.A.C. 7:27-23, 239 N.J.Super. 407, 411, 571 A.2d 971 (App. Div.1990) (quoting American Employers' Ins. v. Commissioner of Ins., 236 N.J.Super. 428, 434, 566 A.2d 202 (App.Div.1989)).
Of course, not every action of a State agency constitutes rulemaking. State v. Garthe, 145 N.J. 1, 7, 678 A.2d 153 (1996). Distinguished from rulemaking is informal agency action, defined as "any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry." Northwest Covenant Med. Ctr., supra, 167 N.J. at 136-37, 770 A.2d 233. Indeed, "`informal action constitutes the bulk of the activity of most administrative agencies.'" Id. at 137, 770 A.2d 233 (quoting In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 518, 524 A.2d 386 (1987)).
In contrast, the APA defines an "administrative rule" as an
agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.

[N.J.S.A. 52:14B-2(e).]
In determining whether agency action constitutes rulemaking courts inquire whether the agency action:
(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable *1100 from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[Metromedia, supra, 97 N.J. at 331-32, 478 A.2d 742.]
These factors are applicable whenever the authority of an agency to act without conforming to the requirements of the APA is questioned, for example, in adopting orders, guidelines, or directives. Doe v. Poritz, 142 N.J. 1, 97, 662 A.2d 367 (1995); Woodland Private Study Group, supra, 109 N.J. at 67-68, 533 A.2d 387; Bullet Hole, Inc. v. Dunbar, 335 N.J.Super. 562, 580, 763 A.2d 295 (App.Div.2000). However, not all of these factors must be present for an agency action to constitute rulemaking; instead the factors are balanced according to weight. State v. Garthe, supra, 145 N.J. at 6, 678 A.2d 153.
Application of the Metromedia factors to the sample leads us to conclude that the DOBI did not engage in rulemaking. To be sure, some factors are present. The sample was intended, for example, to have "wide coverage" encompassing both a large segment of the regulated insurance industry and the general public served by those insurers. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742; See Doe v. Poritz, supra, 142 N.J. at 97, 662 A.2d 367 (holding factor one was satisfied because guidelines for community notification under Megan's Law were intended to have wide coverage, although in applying all of the factors the Court concluded that the guidelines did not constitute rulemaking); St. Barnabas Med. Ctr., supra, 250 N.J.Super. at 144, 593 A.2d 806 (holding factor one was satisfied because agency's approval of a settlement plan containing caps on the amount of settlement that each hospital could collect had wide coverage).
However, application of the second factor, which requires a showing that the action was "intended to be applied generally and uniformly to all similarly situated persons," weighs in favor of a finding of informal action, not rulemaking. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742. The sample was intended to serve as an example of an approved policy to be used as a guideline for insurance companies to assist them in preparing their precertification plans. It was not a blueprint form containing an exhaustive list of services for rigid adherence by all insurers. Notably, some of the subsequently approved policies differed from the sample, containing more or less extensive lists of services requiring precertification. But see St. Barnabas Med. Ctr., supra, 250 N.J.Super. at 144, 593 A.2d 806 ("Exceptions to the caps on the amount of settlement did not prevent them from being applied generally and uniformly to all similarly situated hospitals").
The third factor, whether the action was designed to operate only prospectively, is present because the sample was to be used as a guide by insurance companies seeking approval of decision point review and precertification plans. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742.
However, the remaining factors are not present. The sample does not prescribe "a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization," a factor which deserves significant weight. Ibid; See Doe v. Poritz, supra, 142 N.J. at 98, 662 A.2d 367 (according the greatest weight to this factor in assessing whether promulgation *1101 of guidelines constituted rulemaking). Here the enabling statutory provisions state that
[t]he policy form may provide for the precertification of certain procedures, treatments, diagnostic tests, or other services or for the purchase of durable medical goods, as approved by the commissioner, provided that the requirement for precertification shall not be unreasonable, and no precertification requirement shall apply within ten days of the insured event.

[N.J.S.A. 39:6A-3.1a and -4a.]
of course the specific types of services requiring precertification are not expressly provided for in the enabling statute, and thus adoption of a legal standard or directive specifying a mandatory list of services subject to precertification would have constituted rulemaking. Metromedia, supra, 97 N.J. at 334, 478 A.2d 742. But here the sample did not prescribe a "legal standard or directive." Id. at 331, 478 A.2d 742. The sample did not define minimum acceptable standards, instead it served as a non-binding example, promulgated to assist, and not prescribe, the preparation of insurance policies. Insurers were not required to incorporate any of the language or provisions of the sample into their plans, and were free to develop their own individual list of services. See B.C. v. Cumberland Reg. Sch. Dist., 220 N.J.Super. 214, 234, 531 A.2d 1059 (App. Div.1987) (holding athletic guidelines prepared by an agency in the form of questions and answers to illustrate suggestive solutions to hypothetical factual situations, constituted informal action, not rulemaking); but see Shapiro v. Albanese, 194 N.J.Super. 418, 425-31, 477 A.2d 352 (App. Div.1984) (holding circular letter sent by the Department of Human Services to all counties was an administrative rule).
Similarly, factor five, whether the action reflects a material change in administrative policy, was not satisfied. Metromedia, supra, 97 N.J. at 331, 478 A.2d 742. Here the DOBI has consistently taken the position, in accordance with its enabling statute, that it would not approve policies that require precertification of all, or essentially all, services. N.J.S.A. 39:6A-3.1 and -4. In its July 1999 "guideline," the DOBI indicated that it would approve plans requiring precertification of: 1) diagnostic tests and procedures identified in N.J.A.C. 11:3-4.5(b); 2) non-emergency surgical procedures; and 3) "other services and supplies," including home health care, skilled nursing care, non-emergency hospital care, infusion therapy, and durable medical equipment priced over a stated dollar amount. The sample is entirely consistent with that policy in that it does not require precertification for all services, and essentially repeats the services set forth in the July 1999 "guideline." Thus because the sample does not constitute a material change in policy, this factor was not satisfied.
Finally, the sixth Metromedia factor was not satisfied because the sample does not represent "a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Metromedia, supra, 97 N.J. at 331-32, 478 A.2d 742. Again, the sample is simply a guide to be used by insurance companies in preparing their precertification plans. It is not a statement of policy. In fact, as the DOBI subsequently explained, it did not define in its regulations what treatments, diagnoses and tests are subject to overutilization, and therefore require precertification, because it
believes that insurers are in the best position to decide those treatments, diagnoses or tests for which the benefits of precertification in reducing unnecessary treatment outweigh the cost of administering a utilization review program. The treatments or tests that are overutilized *1102 may change over time and the rules recognize that flexibility is necessary.

[32 N.J.R. 4005, 4008 (November 6, 2000).]
The DOBI's decision not to promulgate a rigid precertification rule addresses the concerns expressed by some insurers that "the costs associated with development, implementation and operation of a system capable of exercising the kind of supervision and control over PIP medical expenses as required by the rules will far exceed any possible savings realized." 30 N.J.R. 4401, 4410 (December 21, 1998). The DOBI responded that insurers can
develop pre-certification plans which the Department believes can also generate substantial cost savings. Each insurer must, of course, exercise this opportunity in a manner that considers both the expense and the cost savings. The Department notes that indemnity health insurers have developed appropriate systems that balance the expense and the cost savings, and believes that auto insurers can do likewise.

[Ibid.

By addressing the policy approvals on a case-by-case basis, the DOBI granted insurers the flexibility to assess their own PIP claims to determine which tests or services were overutilized, and plan their precertification requirements accordingly. That flexibility is not, however, unlimited, as any precertification plan must conform to the relevant statute, regulations, and the informal guidelines distributed by the DOBI. N.J.S.A. 39:6A-3.1 and -4; N.J.A.C. 11:3-4.8.
Moreover, where medical treatment or tests are improperly denied, the insurers' internal appeals process, the dispute resolution process, and the Commissioner's intensive monitoring of decision point and precertification determinations serve as adequate safeguards. N.J.S.A. 39:6A-5.1; N.J.A.C. 11:3-4.10. For example, pursuant to N.J.A.C. 11:3-4.10, insurers must file monthly implementation reports with the DOBI, which information is reviewed by the Personal Injury Protection Technical Advisory Committee (PIPTAC), whose membership includes representatives of the professional boards, who then "closely" monitor the "proper implementation and application of the regulations" and "insure that reimbursement for medical care is not arbitrarily denied." New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 235, 732 A.2d 1063. The DOBI can thus monitor the success of the different precertification approaches to determine which plan most effectively reduces unnecessary medical expenses, while at the same time ensuring that patients receive medically necessary treatment.
We therefore hold that upon applying and weighing the Metromedia factors, the DOBI's development and distribution of the sample constituted appropriate informal action, not rulemaking, and was not subject to APA requirements. We further note that the Parkway policy, upon which the sample was based, once approved, was a public record. Any other insurer would have had access to it if it wanted to see what kind of precertification plan and provisions were deemed acceptable by the DOBI. During this period, insurers were engaged in discussions with the DOBI in formulating their proposed plans. Insurers were inquiring of the DOBI regarding the status of any new guidelines or regulations to assist them in this endeavor. Under these circumstances, circulation of the sample by the DOBI as a non-binding guide was a sensible measure, consistent with the DOBI's regulatory function and the public interest.

C
Subsequent to the distribution of the sample, the DOBI approved decision point *1103 review and precertification plans submitted by approximately twenty insurance companies. Appellants argue that the Commissioner exceeded her authority in approving these plans because they are inconsistent with AICRA, the regulations, and the objectives of the no-fault automobile statute.
Administrative agency actions are presumed to be valid if they are within the statutory authority delegated to the agency, and the burden is on the party challenging the agency action to overcome this presumption. Hills Dev. Co. v. Bernards Tp. in Somerset Cty., 103 N.J. 1, 45, 510 A.2d 621 (1986); New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 229, 732 A.2d 1063. Deference to an administrative agency is especially appropriate where new and innovative legislation is being put into practice. Newark Firemen's Mut. Benev. Ass'n, Local No. 4 v. City of Newark, 90 N.J. 44, 55, 447 A.2d 130 (1982). "Particularly, in the field of insurance, the expertise and judgment of the Commissioner may be given great weight." New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 229, 732 A.2d 1063.
In addition to the Commissioner's broad general authority to promulgate rules necessary to carry out the goals of AICRA, N.J.S.A. 39:6A-1.2, the Legislature also granted her specific authority to approve precertification plans. N.J.S.A. 39:6A-3.1a and -4a. Statutes should be interpreted in accordance with their plain meaning, and where a statute is clear and unambiguous, courts may not impose an interpretation other than the statute's ordinary meaning. National Waste Recycling, Inc. v. Middlesex Cty. Imp. Auth., 150 N.J. 209, 223, 695 A.2d 1381 (1997); Munoz v. N.J. Auto. Full Ins. Underwriting Ass'n, 145 N.J. 377, 384, 678 A.2d 1051 (1996). "Where the statutory language is `clear and unambiguous,' courts will implement the statute as written without resort to judicial interpretation, rules of construction, or extrinsic matters." Bergen Commercial Bank v. Sisler, 157 N.J. 188, 202, 723 A.2d 944 (1999) (quoting In re Estate of Post, 282 N.J.Super. 59, 72, 659 A.2d 500 (App.Div.1995)).
The plain language of N.J.S.A. 39:6A-3.1a and -4a authorizes precertification of "certain" but not all, "procedures, treatments, diagnostic tests, or other services or for the purchase of durable medical goods...." The term "certain" is defined as "[a]scertained; precise; identified; settled; exact; definitive; clearly known; unambiguous," Black's Law Dictionary 225 (6th ed.1990), or as 1) fixed, settled, proved to be true; 2) of a specific but unspecified character, quantity, or degree; 3) dependable, reliable, indisputable; 4) inevitable, incapable of failing, destined; and 5) assured in mind or action. Webster's New Collegiate Dictionary 182 (8th ed.1977). Here a logical reading of the statute conforms with these definitions, namely that the procedures or services subject to precertification are definite or known, but not yet specified. The term, as used in this context, does not denote a quantity or percentage.
Appellants note that "certain" has, in at least one dictionary, been defined as "some though not much," such as in "a certain reluctance." Webster's New Universal Unabridged Dictionary 242 (2d. ed.1992). They argue that in accordance with this definition the Legislature intended that only a small portion of possible treatment, tests, goods and services should be subject to precertification. We reject the contention that this obscure definition should apply. If the Legislature intended such a result it would have expressed it clearly. We are confident that the clear and plain meaning of the term was intended. Our confidence is bolstered by the qualifications *1104 in the statute that the Commissioner, with her broad delegation of authority and her expertise, must approve the items subject to precertification, and they may not be unreasonable.
Thus, the plans and policies ultimately approved in this case are consistent with the statutory language, because although the policies require precertification of many health services and treatments, precertification is not required for all services. It is not required, for example, for treatment within ten days after an accident, treatment subject to care path protocols (which represents the overwhelming majority of automobile accident injuries), emergency care (hospital, surgery or psychiatric), some physician visits, and durable medical equipment under specified dollar amounts. The Commissioner thus acted within her authority in approving policies requiring precertification of some, but not all, services.
Nevertheless, appellants argue that the approved precertification requirements are inconsistent with the no-fault law's policy of reparation, because they will allow insurers to "thwart the ability of claimants" to meet the lawsuit thresholds. Reparation is a general policy goal of the no-fault law. Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323, 744 A.2d 175 (2000).
However, "AICRA's mandate to balance the reparation's objective and the cost-containment aspect of the no-fault act [is] manifest...." New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 237, 732 A.2d 1063. Moreover, AICRA sought to eliminate the overutilization of medical benefits for the purpose of gaining standing to sue for pain and suffering. N.J.S.A. 39:6A-1.1b. In New Jersey Coalition of Health Care, we stated that
the Legislature intended, when it directed the Commissioner to adopt regulations implementing AICRA, to establish some standard of measure and a mechanism to check the prior abuses of the system.
Clearly, AICRA was designed to reduce not only unnecessary PIP medical costs but also to reduce payments on the bodily injury component of auto policies.

[323 N.J.Super. at 238, 732 A.2d 1063.]
Here the approval of the precertification lists does not limit reparation for legitimate, medically necessary care. Instead it implements AICRA's cost-containment goals by providing insurers with the means to control overutilized and unnecessary care, sought solely to bolster a personal injury suit.
We need not address appellants' argument that "[n]othing in the Legislative history supports the breadth of precertification programs which the Commissioner has authorized," because the clarity of the statutory language makes resort to the legislative history unnecessary. Bergen Commercial Bank, supra, 157 N.J. at 202, 723 A.2d 944. Accordingly, we determine that the plain language and policy objectives of AICRA support the Commissioner's interpretation of the statutory provisions governing precertification provisions.
Next, appellants argue that the "approval of such broad based precertification plans makes a sham of the lengthy regulatory process which was undertaken with the care paths, and represents a significant extension of the PIP regulations, without any medical standards or input from the medical profession." We disagree. N.J.S.A. 39:6A-3.1a and -4a authorize the DOBI to develop protocols or care paths in consultation with the medical licensing boards, which it did. N.J.A.C. 11:3-4.6. However, AICRA does not require the same process to be utilized for approval of precertification requirements, and instead requires only Commissioner approval of precertification plans. *1105 N.J.S.A. 39:6A-3.1a and -4a. The Legislature treated the two subjects differently for a logical reason. Protocols establish typical treatment patterns for certain injuries, and thus benefit from review by the professional boards, while the precertification process does not. We therefore find that approval by the Commissioner of the precertification plans without resort to a lengthy regulatory process, including review by the professional boards, was within the scope of her authority and entirely consistent with AICRA.
We next consider appellants' contention that the Commissioner abused her discretion in approving plans which "impermissibly" treat decision point review and precertification alike.
The approved policies make the required substantive distinctions between decision point review and precertification, defining each in accordance with the relevant statutes and specifically identifying which injuries are subject to decision point review, and which services, treatment, tests, or equipment are subject to precertification. Although the approved policies incorporate similar methods for administering the two procedures, we find nothing inherently improper in this arrangement. Subject to our following analysis and conclusions regarding precertification of care path diagnostic tests, we are satisfied that approval of plans and policies which treat the administration of decision point review and precertification similarly, while at the same time properly defining the substantive differences between the procedures, is within the Commissioner's authority.
The final attack on the precertification requirements is appellant's contention that the plans and policy forms require precertification for care path diagnostic tests. We agree that such a requirement would be contrary to the plain language of the DOBI's own regulation, as amended, effective November 6, 2000: "Insurers may require precertification of certain specific medical procedures, treatments, diagnostic tests, other services and durable medical equipment that are not subject to decision point review and that may be subject to overutilization." N.J.A.C. 11:3-4.8(a)(emphasis added).
This amendatory provision is consistent with the DOBI's July 1999 guideline memorandum, which stated that "[m]andated use of pre-certification, in connection with medical treatment of injuries addressed in the Department's care paths is problematic. Decision point review already sets the manner in which treating practitioners must interact with an insurer or its representatives." The provision is also consistent with the enabling statutory provisions, which authorize the Commissioner to establish protocols, which "shall be deemed to establish guidelines as to standard appropriate treatment and diagnostic tests. N.J.S.A. 39:6A-3.1a and -4a(emphasis added). It is also consistent with a response by the DOBI to a commenter on the proposed amendment: "As noted by the commenter, the diagnoses and tests subject to the Decision Point Review requirements, including the Care Paths, cannot be subject to precertification because the decision point review notice system already provides insurers a way to monitor treatment of those injuries." 32 N.J.R. 4005, 4008 (November 6, 2000)(emphasis added).
Having established the care paths, with the assistance of a health-benefits consultant and an ad hoc committee of the professional boards, New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 224, 732 A.2d 1063, and after a thorough regulatory process, the DOBI has incorporated various testing procedures into the treatment of identified injuries. Such tests are thus deemed to be standard appropriate measures when designated in the care paths, subject, of course, to the overriding *1106 requirement that they are medically necessary and clinically supported. N.J.A.C. 11:3-4.7(b)1. See also, N.J.A.C. 11:3-4.6(a) ("Commissioner designates the care paths ... as the standard course of medically necessary treatment, including diagnostic tests, for the identified injuries." (emphasis added)).
Whether a provider submits a proposed diagnostic test to an insurer pursuant to decision point review or for precertification, the insurer has the right to consider it and determine whether it is clinically supported and medically necessary. Under either procedure, therefore, the purpose of AICRA to avoid the overutilization of tests is achieved. The difference is that under decision point review, the burden is on the insurer to object:
Notification to the insurer during the decision point review does not require an affirmative response by the insurer in order for the provider to continue providing treatment. Rather, the decision point review requires notice of a proposed course of treatment in order to provide the insurer with the opportunity to confirm that treatment is medically necessary. 30 N.J.R. 4409. Failure by the insurer to affirmatively deny treatment based on certain established procedures indicates that the treatment may continue.

[New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 225-26, 732 A.2d 1063.]
With precertification, on the other hand, unless the insurer affirmatively gives prior approval, N.J.A.C. 11:3-4.2, the applicable co-pay penalty may be imposed. N.J.A.C. 11:3-4.8(h).
The DOBI does not disagree with these principles, but correctly points out that, while precertification is not required for care path diagnostic tests, decision point review is. N.J.A.C. 11:3-4.7(a) directs insurers to provide a decision point review plan "for the timely review of treatment of identified injuries at decision points and for the approval of the administration of the diagnostic tests in N.J.A.C. 11:3-4.5(b)." (emphasis added). Similarly, N.J.A.C. 11:3-4.7(b) directs the decision point review plan to provide for submission of "prior notice ... together with the appropriate clinically supported findings that additional treatment or the administration of a test in accordance with N.J.A.C. 11:3-4.5(b) is medically necessary." (emphasis added). Thus the regulations do provide for submission of all proposed diagnostic tests for identified injuries for decision point review. The distinction between this procedure and that applicable to non-care path injuries is that the "approval" for an identified injury may occur by the three day silence of the insurer, whereas for non-care path injuries affirmative prior approval is required.
These distinctions should be made clear in the decision point review/precertification plans and all related documents, including informational description of the plan to policy holders and providers, form letters and requests for decision point review and precertification, and in the policy forms. Because the amendment to N.J.A.C. 11:4-8(a), which definitely establishes that precertification is inapplicable to care path injuries, was adopted after the filing of this appeal, we remand on this issue and direct the DOBI to review the provisions of these documents in all approved plans and policies to assure their correctness and clarity in making this distinction, and to require any modifications as may be necessary.

III
We next address appellants' contention that the Commissioner exceeded her authority in approving policy forms that allow copayments for diagnostic testing services, but waive that copayment *1107 where the insured utilizes an approved network. Appellants contend these policy provisions are contrary to AICRA and its implementing regulations and constitute an impermissible effort to control an insured's choice of health care providers. We disagree.
AICRA requires that medical expense benefits be paid "in accordance with a benefit plan provided in the policy and approved by the commissioner." N.J.S.A. 39:6A-3.1a and -4a. In addition to these broad grants of authority, these sections further provide that "[m]edical expense benefits payable in accordance with this subsection may be subject to a deductible and copayments as provided for in the policy, if any," N.J.S.A. 39:6A-3.1a (basic policy), and that "[m]edical expense benefit payments shall be subject to any deductible and any copayment which may be established as provided in the policy." N.J.S.A. 39:6A-4(2) (standard policy). Thus, AICRA clearly authorizes the imposition of copayments.
N.J.A.C. 11:3-4.4(d) authorizes insurers to "offer alternative deductible and co-pay options as part of an approved pre-certification program pursuant to N.J.A.C. 11:3-4.8." N.J.A.C. 11:3-4.8(h) provides that "[p]olicy forms may include an additional co-payment not to exceed 50 percent of the eligible charge for medically necessary diagnostic tests ... that are incurred without first complying with precertification requirements."
Pursuant to this statutory and regulatory authority, the DOBI has approved plans and policy forms that establish copayments for various services, including diagnostic tests, but waive the copayment if the insured utilizes a vendor approved by the insurance company.
We reject appellants' argument that the use of provider networks restricts the ability of individuals to select the provider of his or her choice, and therefore contravenes the principles underlying AICRA. In New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 236, 732 A.2d 1063, we found there was nothing in N.J.A.C. 11:3-4 "which prevents or limits an individual's exercise of choice in selecting physicians or hospitals. The regulations do not infringe upon this freedom of choice. They do serve to impede the inefficient or unbridled use of PIP medical-expense benefits." We further found that
[i]n adopting N.J.A.C. 11:3-4, the Commissioner exercised her statutory authority in a measured but rigorous manner, in recognition of the importance of quality health care for injured automobile accident victims. For example, the Department could have selected maximum treatment limits, as provided under the Individual Health Coverage Program (IHC) and the Small Employer Health Program (SEH). See N.J.A.C. 11:20-1.1 to -20.2, and 11:21-1.1 to -19.4. Under these programs, health insurers sell plans which impose dollar limits or number-of-visit limits for certain treatments. For example, the IHC program allows a 30-visit maximum for physical therapy services to a covered person per calendar year, see N.J.A.C. 11:20, Appendix Exhibit C. Or, a basic benefit system could have been established which introduces concepts more akin to managed care, in which individuals might not be able to select the physician of their choice. Those means were not chosen by the Commissioner.

[Id. at 237, 732 A.2d 1063 (emphasis added).]
Here the Commissioner had the authority to impose some limits on an individual's choice in selecting a vendor. Ibid. She chose to encourage, by financial incentive, but not mandate, the use of certain vendors, and thereby did not interfere with an individual's right to select the vendor of *1108 his or her choice. This action represents a measure that is authorized, reasonable and consistent with AICRA's cost containment goals. These provisions strike a reasonable balance and will not encourage underutilization of benefits subject to copayments nor encourage overutilization of benefits. N.J.S.A. 39:6A-3.1a and -4a. Their approval falls within the broad regulatory authority the Legislature has granted to the Commissioner.

IV
Appellants next argue that the Commissioner exceeded her authority in approving three policy forms which require the submission of PIP disputes to dispute resolution. Appellants argue that these policies improperly bar insureds from access to Superior Court, and are thus "repugnant to AICRA, and unequivocal New Jersey decisions."
The approved Palisades policy, for example, provides that the dispute resolution program "is the sole and exclusive method or remedy for resolving [PIP benefits] disputes," and the Allstate policy provides that "[d]isputes concerning [PIP benefits]... will be resolved by a dispute resolution organization pursuant to New Jersey law," and that the decision "will be binding, but may be subject to vacation, modification, or correction by the New Jersey Superior Court in an action filed pursuant to N.J.S.A. 2A:24A-13." Most of the other approved policies provide that either party to a PIP dispute can initiate the dispute resolution process created by AICRA.
Appellants rely upon N.J.S.A. 39:6A-5i, which provides that "[a]ll automobile insurers... shall provide any claimant with the option of submitting a dispute under this section to dispute resolution pursuant to [N.J.S.A. 39:6A-5.1 and -5.2] (emphasis added)."[6] However, N.J.S.A. 39:6A-5.1a provides that "[a]ny dispute regarding the recovery of medical expense benefits or other benefits provided under personal injury protection coverage ... may be submitted to dispute resolution on the initiative of any party to the dispute ...." (emphasis added).
Appellants suggest that we focus on N.J.S.A. 39:6A-5i, presumably to the exclusion of N.J.S.A. 39:6A-5.1. This we cannot do. "A construction that will render any part of a statute inoperative, superfluous, or meaningless is to be avoided." New Jersey Carpenters v. Borough of Kenilworth, 147 N.J. 171, 179-80, 685 A.2d 1309 (1996)(quoting State v. Reynolds, 124 N.J. 559, 564, 592 A.2d 194 (1991)) cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997).
In reading the sections together, we reach the inescapable conclusion that the AICRA scheme permits not only the claimant, but any party to a PIP dispute to choose dispute resolution rather than a traditional Superior Court action. Although retention of the word "option" in N.J.S.A. 39:6A-5 appears to lend some credence to appellants' argument, we are unpersuaded. Under the pre-AICRA scheme, a claimant's option to submit a PIP dispute to arbitration did not establish an immutable guarantee to be permitted to submit it instead to court. Insurers were merely precluded from depriving claimants of their arbitration option. That option remains in effect with the adoption of AICRA, but as part of the AICRA reforms a similar option is now extended to all parties to a PIP dispute. Just as an insurer was bound by the exercise pre-AICRA of a claimant, so to is a claimant now bound by the exercise of the option by an insurer. *1109 If neither party chooses to submit the dispute to dispute resolution, it may proceed in court.
Appellants further argue that, at the very least, insurers should be compelled to exercise their choice of dispute resolution or court on a case-by-case basis. We fail to comprehend the logic of this argument. If an insurer adopts a blanket policy of choosing dispute resolution in all PIP disputes, it may announce that policy by including it in its policy provisions. Indeed, such an approach has benefits. It is consumer-friendly, in that prospective insureds are advised in advance that if they place their coverage with this company, they will have no opportunity to litigate PIP disputes in court. Further, the need is obviated for the insurer to constantly have to react to PIP lawsuits instituted by their insureds, by moving in court for dismissal in light of its dispute resolution choice. This will avoid unnecessary efforts, time and expense for all parties and will relieve our overcrowded courts of an unnecessary burden.
The pre-AICRA cases relied on by appellants do not support their position, and we find it unnecessary to specifically address them. The DOBI's approval of insurance policy provisions that steer PIP disputes to dispute resolution is consistent with the policy goals of AICRA in that it will foster prompt resolution of disputes without resort to protracted litigation, ease court congestion and reduce costs to the automobile insurance system. This action also furthers the general public policy of this state, which favors arbitration. See Allgor v. Travelers Ins. Co., 280 N.J.Super. 254, 260-61, 654 A.2d 1375 (App.Div. 1995).
Finally, we note that the DOBI has adopted comprehensive regulations prescribing the procedures for resolving disputes concerning payment of PIP benefits. N.J.A.C. 11:3-5. Under the regulations, a request for dispute resolution of a PIP claim may be made by "the injured party, the insured, a provider who is an assignee of PIP benefits or the insurer." N.J.A.C. 11:3-5.6(a). The dispute is "promptly" assigned to a dispute resolution professional (DRP). N.J.A.C. 11:3-5.6(b).
At the request of any party or at the election of the DRP, PIP issues may then be referred to a medical review organization (MRO). N.J.A.C. 11:3-5.6(c). An MRO is "an organization of health care professionals who are licensed in New Jersey, [and] which is certified by the Commissioner to engage in unbiased medical review of the medical care provided to persons injured in automobile accidents." N.J.A.C. 11:3-5.2.
The DOBI has established various criteria to insure the competency, independence, and fairness of the dispute resolution process. N.J.A.C. 11:3-5.4 and -5.5. For example, a DRP must be either: an attorney with at least ten years' experience handling personal injury or workers' compensation cases, a former judge, or an individual qualified by education and with at least ten years' experience in automobile insurance claims and practices, contract law, and judicial or alternate dispute resolution practices and procedures. N.J.A.C. 11:3-5.5(a).
Disputes are resolved through application of substantive New Jersey law, and all decisions must be rendered in writing. N.J.A.C. 11:3-5.4; N.J.A.C. 11:3.5.6(d). Additionally, "[t]he final determination of the dispute resolution professional shall be binding upon the parties, but subject to vacation, modification or correction by the Superior Court in an action filed pursuant to N.J.S.A. 2A:23A-13 for review of award." N.J.A.C. 11:3-5.6(f). We upheld the validity of these regulations in New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 256-269, 732 A.2d 1063.
*1110 We hold that insurance policy provisions providing that all PIP disputes must be submitted to dispute resolution rather than court are statutorily authorized, consistent with the policy goals of AICRA and with our public policy generally, and were properly approved by the Commissioner.

V
We next address the assignment of benefits issue. Appellants contend the DOBI's approved assignment provisions do not constitute reasonable restrictions,[7] but rather establish a system of dominance by the carriers over the provider community.
The statutory provision governing assignment of benefits provides that PIP benefits shall "[n]ot be assignable, except to a provider of service benefits under this section in accordance with policy terms approved by the commissioner, nor subject to levy, execution, attachment or other process for satisfaction of debts." N.J.S.A. 39:6A-4(e)(2).[8] The implementing regulation provides that "[i]nsurers may file for approval policy forms that include reasonable procedures for restrictions on the assignment of personal injury protection benefits, consistent with the efficient administration of the coverage." N.J.A.C. 11:3-4.9(a).
Appellants do not challenge the validity of the regulation, but contend the provisions approved by the DOBI are unreasonable. Generally, the approved policy forms provide that medical expense benefits may be assigned to the provider at the insurer's option if the provider agrees to comply with the requirements, duties and conditions of the policy, including the decision point review and precertification plan, agrees to hold harmless the insured for any reduction of benefits resulting from the provider's failure to comply with the plan, and agrees to submit disputes to dispute resolution.
Review of the history of the statutory authority governing assignment of PIP benefits assists our analysis of this issue. The initial no-fault Law, enacted in 1972, was silent regarding assignability of PIP benefits provided by N.J.S.A. 39:6A-4. L. 1972, c.70. In 1980, we determined that because the no-fault Law contained no express exemption of PIP benefits from execution, the benefits were subject to execution by judgment creditors of an insured. Richman v. Pratt, 174 N.J.Super. 1, 4, 414 A.2d 1371 (App.Div.1980). In 1981, however, the Legislature abrogated the Richman holding, when it amended N.J.S.A. 39:6A-4 to provide that PIP medical expense benefits "shall not be assignable, or subject to levy, execution, attachment, or other process for satisfaction of debts." L. 1981, c.562. In 1983, the Legislature enacted a further amendment, continuing the ban on execution, but authorizing a limited exception to the ban on assignments, providing that PIP benefits shall "[n]ot be assignable, except to a provider *1111 of service benefits under this section." L. 1983, c.362, § 7. Finally, in 1997, a further qualification was added to the authorization to assign benefits to providers, namely that benefits shall "[n]ot be assignable, except to a provider of service benefits under this section in accordance with policy terms approved by the commissioner...." L. 1997, c.151, § 31. This is the present form.
This history demonstrates that the Legislature has progressed from no apparent ban to a total ban on assignments, to a limited exception allowing assignments only to providers, and then to a qualification on that exception, by conditioning assignment provisions on "terms approved by the commissioner." Significantly, throughout this history, the Legislature has never created in providers an entitlement to receive an assignment. This history further demonstrates that the No-Fault Law was intended to inure to the benefit of claimants and that providers (or other creditors) were not intended to enjoy a blanket right to assignment of the claimant's benefits.
The 1983 amendment, while eliminating the total ban on assignments, authorized, but did not require, assignments to providers. Thus, the Legislature did not compel insurers to accept assignments, nor did it prohibit them from imposing reasonable conditions on assignments. The 1997 amendment granted the Commissioner broad authority to approve policy form provisions governing assignments. On the heels of the 1997 amendment, AICRA was enacted in 1998, assigning to the Commissioner a broad grant of authority to control reimbursement of PIP expenses, by directing the Commissioner to establish standards to measure the medical necessity of treatments and diagnostic tests, N.J.S.A. 39:6A-3.1 and 4, and establishing a new dispute resolution mechanism. N.J.S.A. 39:6A-5.1 and -5.2. The Commissioner adopted dispute resolution procedures, N.J.A.C. 11:3-5, and a system by which insurers are enabled to monitor treatments, testing and expenses to ensure that claimants receive only medically necessary services. N.J.A.C. 11:3-4. These measures were aimed at AICRA's goal of reducing insurance costs by reducing overutilization of PIP medical expense benefits and fraud.
It is thus clear that insurers may impose reasonable conditions (or, as referred to in N.J.A.C. 11:3-4.9(a), "restrictions") on assignments. Our consideration of the reasonableness of the disputed conditions is guided by the goals and purposes of AICRA and limited by the deference we must render to the DOBI and its Commissioner in approving those conditions. New Jersey Coalition of Health Care, supra, 323 N.J.Super. at 228, 732 A.2d 1063. Appellants contend that the conditions approved by the DOBI are substantially equivalent to prohibition. They point to six such conditions: (1) requirement of insurer's written consent; (2) hold harmless provision; (3) requirement that provider comply with decision point review and precertification plan; (4) required use of dispute resolution; (5) provision voiding prior assignment based on subsequent conduct; and (6) requirement that provider engage in assertedly overburdensome activity.
Regarding the prior written consent requirement, we note that such provisions were included in policies approved by the Commissioner prior to the 1997 amendment to N.J.S.A. 39:6A-4(2). We deem that amendment, therefore, to be a codification by the Legislature of a preexisting exercise of the Commissioner's general regulatory powers. Inclusion of such provisions in automobile insurance policies, submitted to the Commissioner for approval, *1112 was a preexisting practice in the automobile insurance industry.
Such a provision in a 1995 approved policy was found by the Law Division to be enforceable in Parkway Ins. Co. v. New Jersey Neck & Back, 330 N.J.Super. 172, 748 A.2d 1221 (Law Div.1998). There, the named insured purported to assign PIP medical benefits to a provider without first obtaining Parkway's consent. Id. at 176, 748 A.2d 1221. Parkway expended substantial sums to investigate eligibility for coverage, the validity of the claims, and the medical necessity of the services rendered. Id. at 178, 748 A.2d 1221. But Parkway's efforts were frustrated by the lack of cooperation of the insured and providers, "show[ing] one reason why a prohibition against assignment without Parkway's consent, in the language approved by the Commissioner, is included in all of Parkway's automobile insurance policies." Ibid. The court reasoned that
[t]he policy language provides a pragmatic method of advancing the interests of the insurer to investigate and process claims efficiently (which reduces costs which saving will be passed on to New Jersey motorists) while facilitating the payment of reasonable and medically necessary treatment to an insured. Further, the court finds that the policy language, as approved by the Commissioner, is consistent with statutory language and is not contrary to the Legislature's intent of affording coverage while containing costs.

[Id. at 183, 748 A.2d 1221.]
And the court found that
[p]ermitting unrestrained assignments is contrary to the legislative intent of the Act and the public policy of attempting to reduce insurance premiums to New Jersey drivers. By permitting the insurer to consent to an assignment, when justified, the insurer is able to contain costs. Enforcement of the non-assignment clause does not cause any forfeiture of benefits, either to the insured or his medical providers. Rather, it serves as a cost-controlling measure whereby insurance premiums are stabilized and hopefully reduced by eliminating unnecessary court proceedings, arbitrations and fraud.

[Id. at 184, 748 A.2d 1221.]
We agree with this analysis. Policy forms which require an insurer's written consent, or allow insurers to accept assignments "at their option," can help an insurer reduce costs by eliminating fraud and the propensity for overutilization of services.
Similarly unpersuasive is appellants' argument that the Commissioner abused her discretion in approving policy forms containing a "hold harmless" requirement. Appellants contend that "[n]o health care provider will undertake an assignment if required to assume these types of financial risks."
The Parkway plan, for example, states that if a provider accepts an assignment, it is "required to hold harmless the insured and the Carrier for any reduction of benefits caused by [its] failure to comply with the terms of the Decision Point/Precertification plan." By accepting the assignment of benefits, the provider thus agrees to hold harmless the insured and the carrier in the event of imposition of a copayment penalty, the sanction for failure to comply with the decision point review and precertification plans. N.J.A.C. 11:3-4.7(b)3 and -4.8(h).
The "hold harmless" provisions recognize that providers, not claimants, are usually in the best position to comply with the procedures and notification requirements established under N.J.A.C. 11:3-4. The provision thus encourages a provider to comply with the reimbursement requirements, *1113 while at the same time protecting the innocent claimant from the imposition of copayment penalties. This restriction furthers the goals of AICRA and is reasonable.
Also unpersuasive is appellants' objection to the provision that providers comply with requirements of decision point review and precertification plans. Appellants contend this restriction will force providers to follow an insurer's substantive medical decisions. We reject this contention.
The Allstate policy, for example, provides that "medical expense benefits under this policy may be assigned to a health care provider who complies with the requirements of the precertification." The standards for precertification and decision point review remain the same whether or not the provider agrees to accept the insurance company's conditions for assignment. This provision is not, therefore, a restriction on assignment, because it simply requires a provider to do that which it is already required to do. Therefore, the approved plans do not alter the provider's substantive obligation to treat the patient based on need and professional judgment.
Our resolution of appellants' contention that the Commissioner abused her discretion in approving policy forms which require that a provider utilize the dispute resolution process as a condition of assignment is controlled by our prior determination in this opinion that an insurer is permitted to require the submission of PIP disputes to the dispute resolution process. N.J.S.A. 39:6A-5.1. Because a provider, with a valid assignment, is bound by the same rights and remedies as an insured, the provider can be similarly bound to submit a PIP dispute to dispute resolution. Hartford Fire Ins. Co. v. Conestoga Title Ins. Co., 328 N.J.Super. 456, 460, 746 A.2d 460 (App.Div.)(holding an assignee may not claim a position stronger than an assignor), certif. denied, 165 N.J. 137, 754 A.2d 1213 (2000).
Appellants also object to the Commissioner's approval of policy forms which void an assignment for noncompliance by the provider or insured. Appellants contend that this provision operates as "a retroactive elimination of an assignment based upon conduct over which the provider may have little control." For example, the Parkway policy states that an assignment will become unenforceable if an insured does not attend required independent medical examinations pursuant to N.J.A.C. 12:17-17.2(d) [9] or if a provider does not comply with all requests for medical records, pursuant to N.J.S.A. 39:6A-13.
Compliance with these statutory and regulatory requirements is critical to allowing insurers to control their risk by assuring the medical necessity of a treatment or test for which reimbursement is sought. See Parkway, supra, 330 N.J.Super. at 178, 748 A.2d 1221 (holding insureds and medical providers made little or no attempt to cooperate with Parkway in its attempts to verify the reasonableness of the treatment, and it was because of this lack of cooperation and fraud that the Legislature, commencing in 1977, began to limit eligibility for PIP benefits).
Finally, appellants object to the approval of Security Indemnity's policy which conditions assignment upon a provider's submission of, among other things, a narrative report to substantiate the diagnosis and treatment rendered. Appellants contend that this restriction will discourage *1114 providers from accepting an assignment. However, we find the restriction to be reasonable because it serves as another method of checking the accuracy and necessity of a claim, in compliance with AICRA's cost saving goal.
We therefore hold that the Commissioner did not abuse her discretion in approving the policy forms containing these provisions because we do not find unreasonable the Commissioner's determination that these provisions, individually or collectively, constitute reasonable restrictions on assignment of PIP medical expense benefits. The provisions are authorized by the enabling legislation, the policies of AICRA, and the regulations.

VI
The final point is that raised by appellant Callahan, an Allstate insured, who argues that the Commissioner abused her discretion in approving Allstate's tier rating plan because it violates principles of no-fault insurance and is contrary to public policy.[10]
We need not detail the intricacies of Allstate's tier rating system. Suffice it to say Callahan's renewal premium increased because he made a claim two years prior to his renewal date for PIP benefits as a result of his involvement in a non-fault accident. We begin our analysis of the Commissioner's approval of Allstate's plan by referring to legislation enacted in 1997 that changed automobile rate setting policy. L. 1997, c. 151. The Legislature found and declared that "[c]ertain aspects of the current automobile insurance system are unfair and need to be reformed." N.J.S.A. 17:33B-64b. To that end, the Legislature declared it to be in the public interest to "eliminate the current surcharge system based on automobile insurance eligibility points that unfairly penalizes good drivers because of recent minor traffic infractions, and provide for a system of rating tiers to provide greater flexibility in evaluating and rating risks based on factors that more accurately reflect the driver's characteristics." N.J.S.A. 17:33B-64b(2).
This legislation permitted insurers to establish underwriting rules taking "into account factors, including, but not limited to, driving record characteristics appropriate for underwriting and classification...." N.J.S.A. 17:29A-46.2a. No such rule could reduce a named insured's rating tier "solely on the basis of accumulating six motor vehicle points or less." Ibid. Underwriting rules must be based on objective, specific and verifiable criteria and cannot be based on subjective judgments, such as "pride of ownership" or "poor attitude." N.J.A.C. 11:3-19A.5(b)(3).
Appellants contend that allowing incorporation of non-fault accidents into the tier rating process undermines the no fault system by imposing a penalty for exercising entitlement to no fault benefits, thereby resulting in a chilling effect on consumers seeking necessary treatment and submitting their bills under compulsory insurance. As pointed out by respondents, however, the bottom line test for underwriting propriety does not relate to fault but to whether a criterion constitutes a good predictor for future loss. Placement of insureds into tiers must be based on objective underwriting criteria, supported by a reasonable and demonstrable relationship between the risk characteristic *1115 of the driver and vehicle insured, and the hazard insured against. N.J.A.C. 11:3-19A.3(f) and -19A.5(b)(2). Indeed, criteria are routinely considered in the underwriting process that are unrelated to fault, but serve as reliable predictors of future loss. These include, for example, age, gender and marital status.
The DOBI asserts it approved Allstate's use of the non-fault accident criterion because claims experience may serve as an objective predictor of future risk of loss. Because the filing of claims can increase costs and risks, the DOBI concluded Allstate was justified in utilizing this criterion in its tier rating system. The DOBI thus argues that this is an objective underwriting criterion based upon the relationship between the risk and the hazard insured against, because "[o]ne essential aspect of the business of insurance is to predict the statistical occurrence of certain risks of human or business activities." State Farm Mutual Auto. Ins. Co. v. Department of Pub. Advocate, 118 N.J. 336, 339, 571 A.2d 957 (1990). The DOBI concludes, therefore, that because "[e]very consumer of insurance runs a risk of loss," ibid., prior losses can be good predictors of future losses.
We further note that Callahan did receive the benefit of various rate discounts based on favorable criteria, such as being an Allstate insured for at least three years. Many factors are considered in tier determination and applicable discounts. This comports with the Legislature's purpose of establishing "a system of rating tiers to provide greater flexibility in evaluating and rating risks based on factors that more accurately reflect the driver's characteristics." N.J.S.A. 17:33B-64b(2). Use of a prior non-fault accident claim as a predictor of future loss accords with the statutory authorization to include "driving record characteristics appropriate for underwriting and classification." N.J.S.A. 17:29A-46.2a.
Appellants have failed to demonstrate that the Commissioner's approval of Allstate's tier rating system was arbitrary, capricious or unreasonable, and we accordingly defer to that action. Campbell v. Department of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963).

VII
Subject to our remand and direction that the DOBI review all approved plans and policy forms to assure their correctness and clarity in distinguishing between decision point review and precertification requirements for approval of diagnostic tests for care path and non-care path injuries, and to require any modifications as may be necessary, the actions of the DOBI under review are affirmed. We do not retain jurisdiction.
NOTES
[1] N.J.S.A. 39:6A-4a (the standard plan) contains an identical provision regarding protocols. Under the basic plan, PIP coverage is limited to $15,000 per person per accident, except in the case of more serious permanent or significant injuries where medical expense benefits may not exceed $250,000. N.J.S.A. 39:6A-3.1a. Under the standard plan, PIP benefits may not exceed $250,000 per person per accident. N.J.S.A. 39:6A-4a.
[2] N.J.S.A. 39:6A-4a (the standard plan) contains an almost identical provision regarding precertification.
[3] As required by AICRA, each of the professional licensing boards governing health care also promulgated complementary regulations which list valid diagnostic tests for treating individuals involved in accidents, to be used in conjunction with the health-care protocols promulgated by the DOBI. N.J.S.A. 39:6A-4.7; N.J.A.C. 13:30-8.22 (State Board of Dentistry); N.J.A.C. 13:35-2.6 (State Board of Medical Examiners); N.J.A.C. 13:39A-2.1 (State Board of Physical Therapy); and N.J.A.C. 13:44E-3 (State Board of Chiropractic Examiners).
[4] N.J.A.C. 11:3-4.5(b) sets forth that when medically necessary, consistent with clinically supported findings, and in certain given circumstances, PIP coverage shall provide reimbursement for the following diagnostic tests: 1) needle electromyography; 2) somasensory, visual, brain audio, or brain evoked potential, nerve conduction velocity, and H-reflex study; 3) electroencephalogram; 4) videofluroscopy; 5) magnetic resonance imaging ("MRI"); 6) computer assisted tomographic studies ("CT scan"); 7) dynatron/cyber station/cybex; 8) sonograms or ultrasound; 9) thermography or thermograms; and 10) brain mapping.
[5] Penn National's plan, for example, approved October 12, 1999, includes a list of services identical to the sample plan requiring precertification.

First Trenton's plan, approved October 3, 1999, contains substantially similar decision point review, appeals process, and assignment of benefits provisions but differs in that it requires precertification for: 1) physical therapy treatment (other than for the identified injuries); 2) chiropractic treatment (other than for the identified injuries); 3) non-emergency psychological or psychiatric treatment; 4) pain management treatment (including acupuncture, nerve blocks, and manipulation under anesthesia); 5) treatment and diagnosis of injuries to the temporomandibular joint (TMJ/TMD); 6) non-emergency hospitalization; 7) non-emergency surgery; and 8) durable medical equipment more than $50.
Prudential's plan, approved October 13, 1999, is also similar, although it requires precertification for all: 1) non-emergency surgical procedures; 2) home health care; 3) skilled nursing care; 4) non-emergency hospital care; 5) infusion therapy; 6) non-emergency medical transportation; 7) non-emergency psychiatric treatment; 8) non-emergency dental treatment; 9) treatment for any non-care path injury which extends more than sixty days from the date of injury; 10) durable medical goods costing in excess of $100; 11) non-care path pain management services; and 12) non-care path treatment or testing for soft tissue injury.
And Allstate's plan, approved January 5, 2000, differs in that it requires precertification for all: 1) non-emergency acute care inpatient hospital services, rehabilitation hospital services, ambulatory surgical facilities services and services provided by other licensed facilities; 2) non-emergency field nursing services; 3) non-emergency surgical procedures; 4) therapeutic manipulation conducted by a registered physical therapist or other practitioner; 5) home care; 6) physical therapy; 7) occupational therapy; 8) podiatry; 9) durable medical equipment costing more than $50; 10) non-emergency mental health services; 11) pain management services; 12) prescription drugs; 13) non-emergency dental restoration; 14) restorative therapy; 15) speech therapy; 16) infusion therapy; 17) prosthetic devices; 18) audiology; 19) bone scans; 20) Vax-D (Vertical Axial Decompression); and 21) second opinions within the same or a different specialty.
[6] Prior to enactment of AICRA the statute had provided that "[a]ll automobile insurers shall provide any claimant with the option of submitting a dispute under this section to binding arbitration." N.J.S.A. 39:6A-5h (emphasis added).
[7] In its brief, in addition to disputing the reasonableness of particular restrictions on assignments, appellants also challenged an outright prohibition on assignments contained in First Trenton's 1999 policy form. We note, however, that the form further provides that, at the insurer's option, payment of reimbursable medical expenses may be directed to the provider if the provider and the insured sign the insurer's form for direct payment. Further, the DOBI has furnished First Trenton's decision point review/precertification plan, approved October 3, 2000, which did not prohibit assignments, and its December 28, 2000 correspondence to First Trenton confirming that First Trenton was routinely making direct payments to providers and that it would file necessary conforming alterations to its policy forms. Appellants conceded this development at oral argument. Accordingly, no issue of an outright prohibition on assignments is before us.
[8] N.J.S.A. 39:6A-3.1a contains a similar provision.
[9] N.J.A.C. 12:17-17.2(d) provides that "[i]f a claimant refuses to submit to an independent medical examination ... he or she shall be disqualified for receiving all benefits for the period of disability in question, except for benefits already paid."
[10] Callahan does not seek recovery of a portion of premiums he paid for his policy. He merely seeks a determination that the tier rating system is invalid and must be modified prospectively. When he joined in this appeal, the policy upon which he bases his challenge had expired approximately six months previously. Because of the public interest, we have determined not to dismiss his appeal for lack of timeliness, but to consider it on the merits.